**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SHAWNFATEE BRIDGES, | : | |
| Petitioner | : | CIVIL ACTION |
| | : | No. 06-0268 |
| v. | : | |
| | : | |
| JEFFREY BEARD, et. al. | : | |
| Respondents | : | |

**MEMORANDUM**

**Anita B. Brody, J.**                                                    **April 23, 2013**

Presently before the Court is a petition for a writ of habeas corpus brought by Shawnfatee

"Shawn" Bridges pursuant to 28 U.S.C. § 2254. On February 3, 1998, the petitioner was

convicted of first-degree murder of Gregory and Damon Banks and other crimes in Pennsylvania

state court. After a separate penalty hearing, the petitioner was sentenced to die. His death

sentence has been stayed pending the resolution of these federal habeas proceedings. For the

reasons that follow, I find that the Commonwealth's Brady violations entitle Bridges to a new

trial. In addition, Bridges' ineffective assistance of counsel during the penalty phase entitle him

to a new sentencing hearing. The petitioner raises numerous federal claims for relief, and the

Court's discussion of those claims is necessarily lengthy and complex. To aid in the

understanding of this Memorandum and Order, an Appendix is included listing the disposition of

all claims. I will begin with a discussion of the two claims on which I am granting relief, to be

followed by an examination of the remaining claims.

In brief, Bridges was tried in January and early February 1998 for the murder of cousins

Gregory and Damon Banks in Exeter Township, Pennsylvania, on December 8, 1996. See

1

Commonwealth v. Bridges (Bridges I), 757 A.2d 859, 865-66 (Pa. 2000) (affirming conviction). The evidence at trial showed that Bridges believed that the Banks cousins were responsible for a masked armed robbery of his home. Bridges was not present at the time of the break-in, but his girlfriend was. The prosecution's theory was that the Banks cousins had attempted to rob drugs from Bridges' home and that Bridges was motivated to kill them in part to cement or safeguard his drug-trafficking endeavors. The prosecution charged Bridges solely as an accomplice. It never formally alleged that Bridges had shot the victims himself.

## I. BRADY CLAIM AND PENALTY PHASE INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

**A.      Relevant Legal Standards**

**1.   Exhaustion**

The state courts must have the first opportunity to redress any claimed violation of a habeas petitioner's federal rights. Picard v. Connor, 404 U.S. 270, 275-76 (1971). The habeas statute codifies this principle by requiring that a petitioner "exhaust[] the remedies available in the courts of the State" before seeking federal habeas relief. 28 U.S.C. § 2254(b)(1)(A). The statutory exhaustion requirement applies to each federal claim and is met only when the claim was "fairly presented to the state courts." Picard, 404 U.S. at 275. The Commonwealth alleges that Bridges did not fairly present any of the federal claims in his Third Amended Petition to the Pennsylvania courts when he had the opportunity to do so. Commw. Mem. in Support of Ans. 1-3 (Doc. No. 128).

To fairly present a federal claim, a petitioner must alert the state courts to the federal nature of the claim. McCandless v. Vaughn, 172 F.3d 255, 261 (3d Cir. 1999). Citations to the federal Constitution or to federal case law can provide adequate notice of the federal character of

the claim. <u>Evans v. Court of Common Pleas</u>, 959 F.2d 1227, 1232 (3d Cir. 1992). The petitioner

may also alert the state courts to the federal nature of a claim in subtler ways, including "reliance

on state cases employing [federal] constitutional analysis in like fact situations," or "assertion of

the claim in terms so particular as to call to mind a specific right protected by the Constitution."

<u>Id.</u> Thus, a federal claim may be fairly presented to the state courts even when the petitioner

makes no express reference to federal law. <u>McCandless</u>, 172 F.3d at 261.

  The federal claims made to the state courts need not be identical, word for word, with the

claims now pursued in habeas. <u>See</u> <u>Picard</u>, 404 U.S. at 277 (petitioner is entitled to "variations in

the legal theory or factual allegations used to support a claim"). But the exhaustion requirement

would "serve no purpose if it could be satisfied by raising one claim in the state courts and

another in the federal courts." <u>Id.</u> at 276. A petitioner has exhausted a federal claim only if he or

she presented the "substantial equivalent" of the current claim to the state court. <u>Id.</u> at 278; <u>see</u>

<u>also</u> <u>McCandless</u>, 172 F.3d at 261 (petitioner must present both "factual and legal substance" of

claim to state courts). The claim also must be presented to the correct state courts:

> Because the exhaustion doctrine is designed to give the state courts a full and fair
> opportunity to resolve federal constitutional claims before those claims are
> presented to the federal courts, . . . state prisoners must give the state courts one
> full opportunity to resolve any constitutional issues by invoking one complete
> round of the State's established review process.

<u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999).

  In Pennsylvania, appeals in capital cases—both direct appeals and appeals in post-

conviction collateral proceedings—are taken directly to the Supreme Court of Pennsylvania

without any review in an intermediate appellate court. <u>See</u> 42 Pa. Cons. Stat. Ann. § 9711(h)(1)

(direct appeal); <u>id.</u> § 9546(d) (appeal from denial of PCRA relief). Bridges has thus exhausted

his available state-court remedies if he fairly presented his federal claims to the Pennsylvania

3

Supreme Court either on direct appeal from his judgment of conviction and sentence or during collateral proceedings, pursuant to the Post-Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. Ann. § 9542 et. seq. Either one will suffice: Once a claim is presented to the state court in a direct appeal, it need not be repeated in later collateral proceedings. Castille v. Peoples, 489 U.S. 346, 350 (1989); Swanger v. Zimmerman, 750 F.2d 291, 295 (3d Cir. 1984).

The opinions of the state courts are a natural starting point to determine which federal claims Bridges fairly presented. See Brown v. Cuyler, 669 F.2d 155, 158 (3d Cir. 1982) (exhaustion may be shown "by demonstrating that a state court has expressly decided the issues . . . in [the] habeas petition"). But the exhaustion doctrine requires only that a petitioner's federal claims be "presented to the state courts; they need not have been considered or discussed by those courts." Swanger, 750 F.2d at 295 (emphasis in original). If the state court opinions contain no reference to a petitioner's federal claim, the habeas court must look instead to the petitioner's state-court submissions to determine if the claim was fairly presented. Brown, 669 F.2d at 158; cf. Baldwin v. Reese, 541 U.S. 27, 32 (2004) (claim is fairly presented when it appears within the petition or brief). Here, the relevant filings will be Bridges' appellate briefs to the Pennsylvania Supreme Court and his PCRA petitions.

## 2. AEDPA Deference

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a habeas court may not grant relief with respect to any claim adjudicated on the merits by the state courts unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

4

28 U.S.C. § 2254(d).

The Third Circuit has interpreted these statutory provisions as a three-step inquiry, looking first to the "contrary to" clause, second to the "unreasonable application" clause, and finally to the "unreasonable determination of the facts" clause. Blystone v. Horn, 664 F.3d 397, 417 (3d Cir. 2011). For these purposes, "clearly established federal law" means "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003).

A state court decision is contrary to clearly established federal law under the first clause of § 2254(d)(1) when the state court "applies a rule that contradicts the governing law set forth" in a Supreme Court precedent, or when the state court "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a different result from [the Supreme Court's] precedent." Williams v. Taylor (Terry Williams), 529 U.S. 362, 406 (2000). In these cases, the federal court has de novo review over the state court decision. Johnson v. Williams, 133 S. Ct. 1088, 1097 (2013). When the state court correctly identifies the governing federal precedent but applies it in a debatable manner, the "contrary to" clause is not violated. Terry Williams, 529 U.S. at 405-06.

A state court decision is an unreasonable application of clearly established federal law when the state court "identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. The habeas petitioner must show that the state court decision was objectively unreasonable and not merely incorrect. Id. at 410-411; Blystone, 664 F.3d at 417. "[S]o long as 'fairminded jurists could disagree' on the correctness of the state court's decision," the state court's application of federal law cannot be considered

5

unreasonable. <u>Harrington v. Richter</u>, 131 S. Ct. 770, 786 (2011) (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)).

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

<u>Id</u>. at 786-87 (citations omitted). "The meaning of 'unreasonable' can depend in part on the specificity of the relevant legal rule. . . .  The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations." <u>Yarborough</u>, 541 U.S. at 664.

Finally, a state court decision rests on an unreasonable determination of the facts only if the state court's findings of fact are objectively unreasonable in light of the evidence presented in state court at the time of the state court's adjudication. <u>Blystone</u>, 664 F.3d at 418; <u>see also</u> <u>Cullen v. Pinholster</u>, 131 S. Ct. 1388, 1401 (2011). In general, the state court's findings of fact are presumed to be correct, but the petitioner may rebut this presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

All three of these § 2254(d) inquiries—whether the state court's decision was contrary to federal law, an unreasonable application of federal law, or based on an unreasonable determination of the facts—apply only when the petitioner's federal claim has been "adjudicated on the merits in State court proceedings." If a claim has not been adjudicated on the merits, a federal court will apply <u>de novo</u> review to pure legal questions and to mixed questions of law and fact. <u>Simmons v. Beard</u>, 590 F.3d 223, 231 (3d Cir. 2009).

In <u>Johnson v. Williams</u>, the Supreme Court tackled the issue of whether a case had been adjudicated on merits "when a defendant convicted in state court attempts to raise a federal claim, either on direct appeal or in a collateral state court proceeding, and a state court rules against the defendant and issues an opinion that addresses some issues but does not expressly address the federal claim in question." 133 S. Ct. 1088, 1091 (2013). In this circumstance, the Supreme Court held that the federal claim is presumed to have been adjudicated on the merits, unless the presumption is adequately rebutted. <u>Id</u>. The Ninth Circuit had held that petitioner's Sixth Amendment claim had not been adjudicated on the merits because the state court had overlooked it. <u>Id</u>. at 1094. While the Supreme Court disagreed with the Ninth Circuit's conclusion that petitioner's claim had not been adjudicated on the merits, it affirmed that the presumption of on-the-merits adjudication is successfully rebutted where it is established that a state court has overlooked the federal claim in question.  <u>Id</u>. at 1097-98.  As the Supreme Court explained:

> A judgment is normally said to have been rendered "on the merits" only if it was delivered after the court ... heard and <u>evaluated</u> the evidence and the parties' substantive arguments. And as used in this context, the word "merits" is defined as <u>the intrinsic rights and wrongs</u> of a case as determined by matters of substance, in distinction from matters of form. If a federal claim is rejected as a result of sheer inadvertence, it has not been evaluated based on the intrinsic right and wrong of the matter.

<u>Id</u>. at 1097 (citations omitted) (internal quotation marks omitted).

The <u>Johnson v. Williams</u> Court thus made clear that the deferential standards of § 2254(d) apply to any claim decided on the merits by the state courts, regardless of whether the claim was specifically decided in light of federal precedents. <u>See</u> <u>also</u> <u>Thomas v. Horn</u>, 570 F.3d 105, 115 (3d Cir. 2009) ("For purposes of § 2254(d), a claim has been 'adjudicated on the merits in State court proceedings' when a state court has made a decision that 1) finally resolves the

claim, and 2) resolves the claim on the basis of its substance, rather than on a procedural, or

other, ground."). As long as the state court resolves the petitioner's claim on the merits, it need

not explicitly consider federal law. Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam); see also

Priester v. Vaughn, 382 F.3d 394, 397-98 (3d Cir. 2004) (holding that § 2254(d) applies "even if

the state court does not cite to any federal law as long as the state court decision is consistent

with federal law").

By contrast, § 2254(d) does not apply when a federal claim is fairly presented to the state

courts and the state courts do not decide the claim on the merits. Appel v. Horn, 250 F.3d 203,

210 (3d Cir. 2001). Under those circumstances, the pre-AEDPA standard of review applies: The

habeas court may make an independent judgment of the petitioner's claims, without deference to

the decision of the state courts. Id.; see, e.g., Porter v. McCollum, 130 S. Ct. 447, 452 (2009)

(conducting de novo review where state court failed to decide federal claim on the merits). Even

when § 2254(d) does not apply, "the state court's factual determinations are still presumed to be

correct, rebuttable upon a showing of clear and convincing evidence." Appel, 250 F.3d at 210.

**B.     Brady Claim**

    **1.   Exhaustion**

        **a.   Background**

In his first claim for relief, Bridges argues in the main that the Commonwealth violated

Brady v. Maryland, 373 U.S. 83 (1963), and its progeny by failing to disclose material

impeachment evidence as to prosecution witness George Robles. Third Am. Pet. 9. The

Pennsylvania Supreme Court, hearing Bridges' direct appeal, summarized key portions of

George Robles' trial testimony as follows (the material in quotation marks comes verbatim from

Robles):

At approximately 12 noon on Sunday, December 8, 1996, the [Appellant], Shawnfatee Bridges, and Co–Defendant Richard Morales drove the [Appellant]'s blue minivan to the home of a mutual friend, George Robles. Also present at the Robles' home that day was the third Co–Defendant, Roderick Johnson. When Bridges and Morales first arrived, they spoke with Co–Defendant Johnson, but soon thereafter, they called Robles downstairs. Robles testified at trial that Bridges explained, " . . . how the Banks' boys went in his house with guns to his girlfriend's head and his kid was there and how he was going to take care of them right now." During the same conversation, the [Appellant] said, "I gotta take them out. I am gonna get them and I'm gonna kill them and I'm going to put an end to this forever. Because if I let them get away with it now they are going to try to do it again so I'm going to have to do what I have to do." Then all three co-defendants tried, unsuccessfully, to convince Mr. Robles to join them. Despite Mr. Robles' refusal, the conversation continued with all three co-defendants saying, "we are gonna kill them. We are going to put an end to this." At approximately this point in the conversation, the [Appellant] pulled out a 9 mm. Glock handgun and continued to say how he was "gonna kill them."

Bridges I, 757 A.2d at 865 (internal record citations omitted).

In Bridges' own statement to the police—which was read in its entirety at trial—he admitted that he, Richard Morales, and Roderick Johnson sought out the Banks cousins on the night of the murder to "f— them up" in retaliation for what Bridges believed was the Banks cousins' earlier attempt to rob his home. Notes of Testimony ("N.T.") Vol. IV 1029. But Bridges maintained that he did not intend to kill the Banks cousins, that he was surprised when Johnson began to shoot them, and that he in fact fired a weapon that he found on the ground in the direction of Johnson in an effort to stop the shooting. Id. at 1030.

Against this theory of the defense, the significance of Robles' trial testimony is manifest. His story provided direct evidence that Bridges had the specific intent to kill, not merely to inflict some lesser harm. This was critical to prove the Commonwealth's charge of first-degree murder. As the Pennsylvania Supreme Court explained,

To sustain a conviction for first-degree murder, the Commonwealth must prove that the defendant acted with a specific intent to kill, . . . and that the killing was done with deliberation. It is the specific intent to kill that distinguishes murder in

the first degree from lesser grades of murder.

Bridges I 757 A.2d at 864. It cited the state's accomplice liability law, which explains that a person is liable as an accomplice where, "with the intent of promoting or facilitating the commission of the offense, he (i) solicits such other person to commit it; or (ii) aids or agrees or attempts to aid such other person in planning or committing it . . .". Robles' story also linked Bridges to one of the murder weapons: The evidence at trial showed that both Banks cousins were shot with a 9 millimeter Glock handgun. Id. at 866; see also N.T. Vol. V 1107-08, 1116-17 (evidence that Damon Banks was also shot with a .38 caliber handgun). The Commonwealth emphasized this despite the fact that it had not charged Bridges as the shooter.

In his habeas petition, Bridges points to other trial evidence that added further gravity to Robles' testimony about the Glock. Third Am. Pet. 12. Fire Marshal Terry Francis testified during his after-the-fact examination of the van, he observed what appeared to be a bullet hole in the front passenger seat; when he placed a metal rod through the hole and followed the presumed trajectory of the bullet, he found a bullet fragment near the driver-side rear wheel well. N.T. Vol. IV 942. That linear path suggested that a bullet was fired from the direction of the front passenger side of the van towards the victims, seated in the van's middle seats. The projectile recovered by Francis was identified by another police witness as coming from a 9 millimeter handgun. N.T. Vol. V 1113. In Bridges' own statement to the police, he placed himself in the front passenger seat at the start of the shooting. N.T. Vol. IV 1032-33. The testimony from Fire Marshal Francis thus may have provided some support for Robles' story, in that the 9 millimeter bullet path from the front passenger seat towards the victims was consistent with Robles' claim that Bridges had a 9 millimeter Glock and intended to kill the Banks cousins that night. This is significant because Bridges was charged only as an accomplice.

**b.   Claim I.B.1: Withholding Material Impeachment Evidence as to Robles**

The gravamen of Bridges' <u>Brady</u> claim is that the prosecution should have disclosed several police reports that could have been used to impeach George Robles' credibility by showing that "Robles had very real motives to lie in any way necessary to curry the favor of the prosecution and avoid further scrutiny of his own illegal activities." Third Am. Pet. 11. Bridges believes that the police reports[1] could have been used to show that Robles was engaged in the sale of drugs and other associated ills, like gun crimes, prior to Bridges' trial; that Robles was not a reluctant witness, as the prosecution claimed, but instead a willing cooperator who had volunteered information in exchange for leniency in the past; and that Robles' desire to protect his drug enterprise provided a strong incentive for him to falsify his testimony to aid the prosecution. <u>Id.</u> at 17-35; Pet'r Supp. Mem. in Support of Third Am. Pet. 5-6 (Doc. No. 124).

Bridges argues that he exhausted this <u>Brady</u> claim in two steps. Pet'r Second Reply to Resp't Mem. 7-8 (Doc. No. 132). He maintains that the legal basis for this claim was first presented to the Pennsylvania Supreme Court on appeal from the denial of his first PCRA petition, while the factual basis for this claim—the allegedly withheld evidence—was submitted during his second PCRA proceeding. <u>Id.</u>

The first step is clearly borne out by the record. In his first PCRA petition, Bridges requested discovery of any police reports showing that Robles was a paid informant prior to trial or that Robles had dealt, possessed, or transported drugs prior to or during the trial. Am. Pet. for Habeas Corpus Relief and Statutory Post Conviction Collateral Relief of Dec. 12, 2003, at 18 (hereinafter "First PCRA Pet."). Bridges also requested funds to investigate evidence that might undermine Robles' credibility. <u>Id.</u> at 13-15. As to the latter request, Bridges advised the PCRA

---

[1] *See* Part I.B.2 for a full discussion of the undisclosed evidence.

court that "[w]ithout said investigation, Petitioner is unable to determine whether he should properly plead and prove a Brady violation." Id. at 17. Both requests were denied by the PCRA court, and the denials were affirmed on appeal. Bridges II, 886 A.2d at 1130-31.

The Bridges II opinion of the Pennsylvania Supreme Court does not address the potential constitutional underpinnings of Bridges' claim. The state court merely held that Bridges had failed to show good cause for discovery under state law. Bridges II, 886 at 1131. But the constitutional claim was fairly presented in Bridges' briefing. First PCRA Br. 11-19 (Doc. No. 68 at A393, A415-23). Although Bridges framed his claim as a request for discovery, he also cited Brady and other federal cases to alert the state court that he believed the prosecution to be in possession of impeachment evidence that he had a constitutional right to receive prior to trial. Id. at 14, 16.

This first post-conviction trip through the state courts was sufficient to fairly present the legal basis for Bridges' Brady claim. As he points out, the Supreme Court has found exhaustion on similar facts. See Pet'r Second Reply 7-8 (citing Banks v. Dretke, 540 U.S. 668, 690 (2004)). In Banks, the Supreme Court held that the petitioner had fairly presented the legal basis for his claim by alleging that material impeachment evidence had been withheld in violation of Brady, even though the petitioner was not (yet) in possession of the allegedly withheld evidence. 540 U.S. at 690. Bridges' claim to the state courts was at least as specific and detailed in its allegations as was the claim in Banks.

Whether the state courts also had the opportunity to address the factual basis for the claim is more debatable. Both the "factual and legal substance" of a petitioner's claim must be presented to the state court to satisfy the exhaustion requirement. McCandless, 172 F.3d at 261 (emphasis added); cf. Banks, 540 U.S. at 690-91 (distinguishing between exhaustion of factual

and legal basis for <u>Brady</u> claim). The factual basis for Bridges' <u>Brady</u> claim is a series of police reports concerning George Robles that he claims should have been disclosed as material impeachment evidence prior to trial. The Commonwealth stipulated that these documents were not disclosed during pre-trial discovery. N.T. PCRA Hearing 46-47, No. 117-97, Docket No. 181 (C.P. Berks County, Sept. 2, 2009) ("PCRA Hearing II"). These police reports first came to light during federal habeas proceedings, after I granted Bridges' requests for discovery.[2] After Bridges had received the police reports, he submitted a second PCRA petition. He relies on this second petition for exhaustion of the factual basis for his <u>Brady</u> claim. Pet'r Second Reply 8.

Bridges' presentation of the <u>Brady</u> claim to the state court was confusing, as Bridges offered somewhat conflicting arguments throughout the second PCRA proceedings. His second PCRA petition did indeed discuss the Robles police reports, which were attached as exhibits. <u>See</u> Pet. for Habeas Corpus Relief of Dec. 12, 2008, at 3, 14-26 (Doc. No. 123, Ex. 53) (hereinafter "Second PCRA Pet."). But Bridges did not ask the second PCRA court to reexamine his <u>Brady</u> claim in light of these reports. In fact, he erroneously advised the court that the <u>Brady</u> claim had already been litigated in his first PCRA petition. <u>Id.</u> at 14 n.4. Of course, this issue had not been previously litigated, as Bridges had only recently discovered the withheld police documents that

---

[2] On April 26, 2007, I granted Bridges' second motion for discovery, which requested, in essence, documents relating to Robles' interactions with police and other materials that would shed light on Robles' motivation in testifying. After police reports were turned over for the first time in September 2007, Bridges amended his federal habeas petition and submitted a request for additional discovery relating to Robles. The Commonwealth repeatedly opposed discovery. In April 2008, I granted Bridges' request to see any and all notes between Robles and the District Attorney who tried the case, as well as his request to submit interrogatories to investigator Cabrera regarding his relationship with Robles. In March 2009, Bridges requested a stay in the federal proceedings so that he could return to state court and exhaust his remedies there, in light of the new evidence disclosed during discovery, which I granted. The federal proceedings were resumed two years later, in March 2011, after Bridges had completed his second PCRA proceedings.

formed the foundation of the Brady claim. Mysteriously, rather than presenting an independent Brady claim, Bridges presented this evidence as part of his claim that the Commonwealth acted in bad faith throughout Bridges' trial, and used the documents relating to Robles as evidence to buttress his claim of unconstitutional prosecutorial misconduct, under Youngblood v. Arizona, 588 U.S. 51 (1988). However, the petition repeatedly cited Brady. During the hearing held in the Berks County Court of Common Pleas, Bridges' attorney told the court,

> There are two issues, as I see it, to be the subject of this hearing. The first is a destruction of evidence issue . . . The other issue deals with exculpatory material in the nature of police reports that deal with and involve the principle witness in the trial against Mr. Bridges, and that is Mr. George Robles.

N.T. PCRA Hearing II 6:10-2, 7:7-10. Bridges' attorney also discussed the elements of a Brady claim. He explained that the evidence "would be characterized as exculpatory material under the Brady case," Id. at 10:5-7. Alluding to prejudice, he explained that the evidence "would be significant, very significant in evaluating the credibility of this witness," Id. at 10:12-13, and would have "provide[d] ammunition for cross examination to demonstrate interest on the part of Robles and why Robles was such a cooperative witness with the prosecution in this case." Id. at 10:21-23. In its response, the Commonwealth specifically contested the existence of a Brady claim, arguing that the Robles documents had never been requested, "and so there can't be a Brady violation." Id. at 16:23.[3]

In the post-hearing briefs submitted to the common pleas court, Bridges once again presented the Robles evidence in the context of a prosecutorial misconduct claim. But again, he repeatedly cited Brady. For example, he cited Brady to support his statement that "federal due

---

[3] Of course, under Brady, it is the government's affirmative duty to provide exculpatory and impeaching evidence, and not the defense's duty to request it. See Kyles v. Whitley, 514 U.S. 419, 432 (1995).

process requires a prosecutor to disclose favorable evidence to the accused." Pet'r Post-Hearing Memorandum in Support of Petition for Habeas Corpus Relief 22, Nov. 25, 2009. He explained the prejudice resulting from the suppression of the Robles documents: "Had the police reports involving Robles been turned over to the defense, trial counsel would have been able to expose as false Robles' testimony—and the former District Attorney's argument—that Robles was not engaged in the drug trade and had no motive to testify favorably for the prosecution." Id. at 24. Further, the petition stated that none of the issues raised were previously litigated. Id. at 34. This suggests that Bridges recognized the omission in his earlier brief, and corrected it for the court during the hearing and the post-hearing briefing.

Bridges satisfied the requirement that he exhaust his state-court remedies as to the factual and legal bases of his Brady claim. He repeatedly cited Brady in his briefs and arguments to the court, and presented evidence relevant to the elements of a Brady claim. Although his first brief to the state court during his second PCRA proceedings mistakenly represented that the claim was previously litigated, his arguments during the hearing and his subsequent briefing put the court on notice of a potential Brady claim. Under the circumstances, the purpose of the exhaustion doctrine—ensuring that the state courts have a first chance to redress any claimed federal constitutional violations—was satisfied. See Harrington, 131 S. Ct. at 787 (describing the exhaustion requirement "as designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions").

### 2. Merits Discussion

In Claim I.B.1 of his Third Amended Petition before this Court, Bridges argues that the prosecution withheld police reports that constitute material impeachment evidence as to George Robles, in violation of the due process right recognized in Brady v. Maryland, 373 U.S. 83

(1963), and <u>Giglio v. United States</u>, 405 U.S. 150 (1972). Third Am. Pet. 11.

    **a. State-Court Decision**

As a threshold matter, Bridges asserts that the deferential standard of review required by 28 U.S.C. § 2254(d) does not apply to his <u>Brady</u> claim because the state court failed to decide it despite two opportunities to do so. Pet'r Mem. in Support of Pet. 21; Pet'r Supp. Mem. 10. Bridges presented the legal basis for his <u>Brady</u> claim during his first PCRA proceeding, in the context of arguing that he was entitled to discovery of any evidence in the Commonwealth's possession that George Robles was a paid informant or a drug dealer. The Pennsylvania Supreme Court affirmed the denial of Bridges' discovery request without any discussion of the potential <u>Brady</u> issue:

> We review the denial of a discovery request for an abuse of discretion. <u>See</u> <u>Commonwealth v. Williams</u>, 557 Pa. 207, 732 A.2d 1167, 1175 n.5 (1999). Appellant has failed to prove a discovery violation where he has not identified specific documents that were withheld by the Commonwealth or other evidence that suggested Robles was a paid informant or a drug trafficker. <u>See</u> <u>id.</u>, at 1175 (no abuse of discretion where appellant failed to identify specific documents not produced). Appellant is not entitled to relief where he has made a general request for the discovery of documents without first proving their existence. As appellant has failed to make the requisite showing, we find no abuse of discretion in denying appellant's discovery request.

<u>Bridges II</u>, 886 A.2d at 1131.[4] Bridges later presented the factual basis for his <u>Brady</u> claim—the police reports—with his second PCRA petition, in the context of his <u>Youngblood</u> claim. The PCRA court devoted a single paragraph to the issue in its opinion, saying that the allegation of improper evidence suppression "appears to have needlessly reared its head in these proceedings."

---

[4] <u>Bridges I</u>, decided in 2000, is the opinion of the Pennsylvania Supreme Court on Bridges' direct appeal. <u>Bridges II</u>, decided in 2005, is the opinion of the Pennsylvania Supreme Court on appeal of Bridges' first PCRA petition. <u>Bridges III</u>, decided in 2010, is the opinion of the Berks County Court of Common Pleas on Bridges' second PCRA petition.

Bridges III, slip op. at 15. It quoted the Commonwealth's discussion—which was also only one paragraph—nearly in full to say that the claim "in no way shape or form has anything to do with the allegation involving" the prosecutor's bad faith destruction of evidence. Id. The court concluded that "[t]he alleged withholding by the Commonwealth of impeaching documents concerning George Robles has already been litigated and we see no need to further discuss it here." Bridges III, slip op. at 15. The Pennsylvania Supreme Court denied leave for further review without explanation.

Notwithstanding the Court of Common Pleas' description of the issue as "already . . . litigated" in Bridges III, it does not appear that the state courts ever decided whether Bridges was entitled to receive these police reports under Brady. At most, in Bridges II the Pennsylvania Supreme Court determined that Bridges had failed to identify any specific withheld documents—a difficult showing to make without the actual documents, for obvious reasons—and thus was not entitled to discovery as a matter of state law.[5] The situation appears to be analogous to Cone v. Bell, 556 U.S. 449, 472 (2009), a habeas case in which the Supreme Court conducted de novo review of a Brady claim that the state courts had declined to address on the inaccurate view that the claim had already been litigated in prior state court proceedings. Here, by stating that the claim warranted no discussion, the state court made it explicit that that it was refusing to evaluate

---

[5] To be precise, the Pennsylvania Supreme Court held that it was not an abuse of discretion for the trial court to deny Bridges' request for discovery. Bridges II, 886 A.2d at 1131. The case cited in Bridges II as authority for the abuse-of-discretion standard was Commonwealth v. Williams, 732 A.2d 1167 (Pa. 1999), and Williams does contain a brief discussion of Brady, see id. at 1175-76 (holding that Brady does not does "require[] the PCRA court to enter a specific order directing the production of exculpatory documents from the Commonwealth"). But the citation to Williams shows only that the state court did not believe that Bridges had a constitutional right to discovery during post-conviction proceedings; it can hardly be read as a decision on the merits of Bridges' claim that he had a constitutional right to receive the police reports prior to trial.

"the intrinsic rights and wrongs wrong of a case." Johnson v. Williams, 133 S. Ct. 1088, 1097

(2013).  As no state court has decided the legal merits of Bridges' Brady claim, federal habeas

review is plenary.

    **b.  The Undisclosed Evidence**

The police reports at issue document five episodes involving George Robles prior to

Bridges' trial in January 1998. None of the reports were disclosed to Bridges at the time of his

trial. The first episode occurred in February and March 1996, nearly two years before Bridges'

trial, when Robles came to the attention of the Reading police department after he was accused

by relatives of his then-girlfriend, Lucy Cintron, of threatening them with a handgun during an

altercation. Pet. Ex. 21, Doc. No. 55-1, at 37-38. Nothing came of the accusation after Robles

denied it and the two complaining witnesses declined to press charges. Id. at 40. In the course of

speaking to the police about the alleged incident, Robles volunteered to provide information in

confidence to Criminal Investigator Angel Cabrera regarding the murder of a relative of Cintron

in New York. Id. Cabrera arranged for Robles to speak with another officer, whom Robles told

that Cintron's relative was murdered because of the relative's involvement in a scheme to deal

cocaine in the Reading area. Pet. Ex. 48, Doc. No. 102-4, at 19.

The second episode began on April 25, 1996, roughly 18 months before Bridges' trial,

when the Reading police responded to a shooting outside Robles' residence. Pet. Ex. 22, Doc.

No. 55-1, at 42-44. Robles was neither a suspected shooter nor a victim; indeed, he told the

police that he was inside his home smoking marijuana during the shooting and had not witnessed

anything. Id. at 48-50. In the course of investigating the shooting, the police determined that a

juvenile living with Robles—Edwin Ruiz, described as Robles' cousin—had stashed a red bag

containing two handguns and numerous individually-packaged bags of crack cocaine in a nearby

18

apartment shortly after the shooting. Pet. Ex. 23, Doc. No. 55-2, at 3-5. Some of the crack was stored inside a cigar box, and Robles' fingerprint was found on the box. Id. at 5-11, 28, 32. Ruiz was the only person arrested or charged in connection with the drugs. See id. at 36-39.

The April 1996 episode is significant, in Bridges' view, not just for the drugs charged to Ruiz but also for the police investigation of the apartment in which Ruiz tried to hide the red bag. Third Am. Pet. 26-28. The apartment was occupied by Amy Sell and her boyfriend, Rafael Melendez. Pet. Ex. 23, Doc. No. 55-2, at 15. A third man, Juan Rodriguez, was also present when the police arrived to recover the red bag. Pet Ex. 22, Doc. No. 55-1, at 49, 51. It was Sell who told the police that Edwin Ruiz had come to the residence and had asked to hide the red bag there, which Melendez agreed to do. Pet. Ex. 23, Doc. No. 55-2, at 6-7, 16.

Melendez told the police that he placed the red bag in a closet where he was keeping a safe for George Robles, who paid him $20 per week for the privilege. Pet. Ex. 23, Doc. No. 55-2, at 17. Melendez also told the police that, after the red bag had been seized, he asked Juan Rodriguez to remove the safe from the apartment. Id. Rodriguez confirmed this and told the police that he ultimately put the safe in a garage near his own residence. Pet. Ex. 22, Doc. No. 55-1, at 49. The police recovered the safe from there and returned it to Robles, who had reported it as stolen. Id. at 49, 52; Pet. Ex. 24, Doc. No. 55-2, at 42. The safe appears to have been open when the police recovered it. Pet. Ex. 22, Doc. No. 55-1, at 52. Robles told the police that the safe contained only some money and his birth certificate. Id. at 50; Pet. Ex. 24, Doc. No. 55-2, at 42. Amy Sell reported that Robles had told her the same thing when he asked to store the safe in the apartment where she and Melendez resided. Pet. Ex. 23, Doc. No. 55-2, at 18. But, according to the police reports, both Melendez and Sell told the police that they suspected Robles was a drug dealer, and Melendez claimed to have seen Robles use the safe to store crack cocaine, a

19

mobile phone, cash, and a gun. Id. at 17-18. An acquaintance of Edwin Ruiz's mother also told the police during this investigation that she thought Robles was dealing drugs. Pet. Ex. 22, Doc. No. 55-1, at 50-51. He was not arrested or prosecuted.

The third episode occurred nearly a year later, in August 1997, about six months before Bridges' trial. Reading police responded to a report of gunfire and found Robles among a crowd of people at the scene. Pet. Ex. 34, Doc. No. 55-5, at 2-3. Robles was carrying a 9 millimeter handgun for which he had a valid permit. Id.[6] Shell casings found at the scene matched the ammunition in Robles' gun. Id. at 3. Robles had been drinking, and the police confiscated his gun. Id. at 4-5. Once again, he was neither arrested nor charged.

The fourth episode occurred in September 1997 and was similar to the August 1997 incident. The Reading police responded to a report of gunfire in an alley near 543 Cedar Street. Pet. Ex. 35, Doc. No. 55-5, at 9. The police questioned Robles—then apparently living at 545 Cedar Street with Lucy Cintron—and he denied hearing anything. Id. In a report of the incident, one of the responding police officers wrote that "Robles and another occupant…are involved in drug dealing at 10th and Elm Streets and possibly at 545 Cedar Street." Id. No arrests were made and no charges were filed.

---

[6] Robles obtained the gun permit on February 14, 1997. Pet. Ex. 31, Doc. No. 55-3, at 56. By then, he had already implicated Bridges, Roderick Johnson, and Richard Morales in the murder of the Banks cousins, which occurred in December 1996. Pet. Ex. 29, Doc. No. 55-3, at 50. Robles was also a source of police information and an eventual prosecution witness for a second murder committed by Johnson. Id. at 46-48; see also Johnson v. Folino, 735 F. Supp. 2d 225, 230 (E.D. Pa. 2010) (summarizing Robles' testimony at trial in Commonwealth's successful prosecution of Roderick Johnson for the murder of Jose Martinez). In late February 1997, after Robles failed to appear at a court hearing related to one of the murder prosecutions—the record is not entirely clear which one—he was detained for several weeks as a material witness. Third Am. Pet. 28-29; see also Pet. Ex. 32, Doc. No. 55-4, at 31 (material witness bail order); N.T. Vol. V 1071-73, 1083-84 (Robles' trial testimony regarding detention as material witness).

The fifth and final episode occurred in November 1997, two months before Bridges' trial, when the police again responded to a report of gunfire in the vicinity of 545 Cedar Street. Pet. Ex. 38, Doc. No. 55-6, at 3. Lucy Cintron told the police that shots were fired after a dispute over a bicycle. Id. at 8. The police confiscated a firearm that was legally registered to George Robles and that had been fired in the episode. Id. at 5-6, 8-10. But Robles told the police that he was at a nearby bar during the shooting, and nothing in the police records contradicts this story. Id. at 4, 8-9. In his report of the incident and subsequent investigation, Criminal Investigator Cabrera stated that Robles' gun permit should be revoked but that there was insufficient evidence to connect the seized handgun to any shooter. Id. at 9. Although some property was damaged, no one was hurt in the November 1997 incident and apparently no one was arrested or charged.

These were the undisclosed police reports regarding George Robles. Bridges has supplemented this presentation with some additional but distinct material—e.g., police reports of two arrests of Lucy Cintron in 1997 for drug charges, none of which mention Robles. Pet. Ex. 33, Doc. No. 55-4, at 39-41, 54; Pet. Ex. 36, Doc. No. 55-5, at 13-14. Bridges has also submitted records of Robles' illegal conduct after Bridges' trial—records which cannot possibly have been Brady material. See Pet. Ex. 7, Doc. No. 17-2 & 17-3 (affidavit of probable cause for search warrant in 2001 narcotics investigation); Pet. Ex. 8, Doc. No. 17-4, at 4 (Robles' guilty plea to various state drug charges in 2001); Pet. Ex. 9, Doc. No. 17-4, at 12 (state court order in 2002 sentencing Robles to a prison term of eleven to twenty-four months).

Finally, Bridges offers several affidavits from persons who knew Robles or from defense investigators who claim to have interviewed such persons; the gist of the affidavits is that it was a matter of common knowledge that Robles was a drug dealer. See Pet. Ex. 12, Doc. No. 17-4, at 42-44 (unsigned affidavit of Priscilla Cruz); id. at 50-52 (affidavit of Wilfredo Velez); Pet. Ex.

15, Doc. No. 29-13, at 6-8 (affidavit of Orlando Alvarado); id. at 15-16 (affidavit of Liz Ruiz);

id. at 19-20 (affidavit of Allyn Ammons); id. at 21 (affidavit of Jamie Hess); Pet Ex. 16, Doc.

No. 31, at 4-5 (affidavit of defense investigator as to statement by Carlos Diaz, former member

of Robles' "Night Life Clique" gang); Pet. Ex. 47, Doc. No. 60-4, at 2-3 (affidavit of defense

investigator as to statement by Dorothy Colona); Pet. Ex. 49, Doc. No. 102-4, at 33-34 (affidavit

of defense investigator as to statement by former Det. Bruce Dietrich). Bridges does not give any

reasons to suppose that these witnesses were suppressed or made unavailable to him at trial by

the prosecution. Instead, his Brady theory appears to be that if the prosecution had disclosed the

above-described police reports, the reports would have led his trial counsel to investigate and

discover these witnesses. Third Am. Pet. 49.

### c.  Brady Analysis

 "A Brady violation occurs if: (1) the evidence at issue is favorable to the accused,

because either exculpatory or impeaching; (2) the prosecution withheld it; and (3) the defendant

was prejudiced because the evidence was 'material.'" Breakiron v. Horn, 642 F.3d 126, 133 (3d

Cir. 2011). "Evidence is material if there is a reasonable probability that, if the evidence had

been disclosed, the result of the proceeding would have been different." Wilson v. Beard, 589

F.3d 651, 665 (3d Cir. 2009). "A 'reasonable probability' of a different result is shown when the

government's suppression of evidence 'undermines confidence in the outcome of the trial.'" Id.

(quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)).

There is no doubt that the police records relating to Robles are impeaching, and thus

favorable to Bridges. They present evidence that Robles was involved in some way in at least

four shooting incidents in an 18-month period. They also indicate a high probability that Robles

was involved in the drug trade. Indeed, in at least one report, the police officer noted as a fact

that Robles was dealing drugs in his neighborhood. Pennsylvania law bars the impeachment of witnesses with conduct that did not lead to a criminal conviction. Com. v. Crangle, 422 A.2d 547 (Pa. 1980). Similarly, a witness "may not be impeached by questions concerning criminal activity not resulting in arrest." Com. v. Taylor, 381 A.2d 418, 419 n. 4 (Pa. 1977). However, while evidence of uncharged crimes may not have been admissible to impeach Robles' character, his numerous run-ins with the law—none of which resulted in his arrest—could have been used to demonstrate his potential bias in favor of law enforcement. See U.S. v. Abel, 469 U.S. 45, 53 (1984) ("Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness's testimony"); Com. v. Evans, 512 A.2d 626, 631 (Pa. 1986) (a witness's potential bias in favor of the prosecution must be made known to the jury). Indeed, "it is always the right of a party against whom a witness is called to show by cross-examination that he has an interest direct or collateral in the result of the trial." Id. at 632 (quoting Com. v. Cheatham, 239 A.2d 293, 296 (1968)).

The evidence regarding Robles' past run-ins with law enforcement point to a potential bias that Bridges had a right to examine during questioning of Robles. The documents suggest that Robles may have had a motivation to lie to curry favor with the police to protect this drug business and to stay out of police custody. The Pennsylvania Supreme Court explicitly acknowledged the potential for such a bias, when it declared its "willingness to acknowledge what we had previously thought was too speculative: that a prosecution witness may be biased because of the expectation of leniency in some pending matter even when no promises have been made." Evans, 512 A.2d at 632. The evidence therefore satisfies the first requirement of Brady, because it was favorable to the defendant as potential impeachment evidence.

It is also clear that the evidence was withheld from the defense. The evidence at issue was generated by police agencies and thus was undoubtedly in the constructive possession of the prosecution and subject to disclosure. Cf. Wilson, 589 F.3d at 659 (prosecution charged with disclosing evidence in possession of police agencies). The Commonwealth had an affirmative duty to disclose all potentially favorable evidence to Bridges. See Kyles v. Whitley, 514 U.S. 419, 432 (1995). The prosecution told Bridges' lawyers that it had given them "unlimited discovery." N.T. Omnibus Pretrial Hearing 2, No. 117-97, Docket No. 80 (C.P. Berks County, Sept. 19, 1997). It failed to meet its obligation when it failed to turn over the police records pertaining to Robles. See N.T. PCRA Hearing II 46-47 (Commonwealth stipulating that it did not provide the police reports regarding Robles to the defense during pre-trial discovery). Bridges had a right to cross-examine Robles on his potential bias in favor of the prosecution, and the withheld documents deprived him of the ability to meaningfully inquire about Robles' motive to testify.

As to the evidence's materiality under Brady, I must determine whether the suppression of these documents undermines confidence in the outcome of Bridges' trial. The Third Circuit recently evaluated these exact same documents in the context of an unrelated murder case in which Robles was also the star witness—and during which the prosecution similarly withheld the evidence about Robles' prior involvement with law enforcement. In that case, Johnson v. Folino, 705 F.3d 117 (3d Cir. 2013) ("Johnson"), the petitioner had procedurally defaulted on his Brady claim. The district court first determined that the evidence about Robles' repeated interactions with the police could not be prejudicial because they would have been inadmissible under state law to impeach his credibility. Johnson v. Folino, 671 F.Supp.2d 658, 669 (E.D. Pa. 2009). Even if the evidence were admissible, the district court determined that it was not material because it

did not undermine confidence in the verdict. Id. at 670. On reconsideration, the district court

determined that the evidence would have been admissible to impeach Robles for bias, and could

be deemed material, but that it would still be inadmissible because it was "extremely speculative,

tangential to the issues . . . , and was likely to confuse the jury." Order Granting Pet'r Mot. for

Partial Reconsideration 1 n.1, Johnson v. Folino, No. 04-2835, (Aug. 8, 2011). The court thus

denied Johnson's habeas petition but granted a certificate of appealability on the Brady claim. Id.

On appeal, the Third Circuit disputed the lower court's determination of the evidence's

admissibility, and emphasized that admissibility is not the touchstone of materiality:

> The materiality standard, however, is not reducible to a simple determination of
> admissibility. Rather, we believe . . . that inadmissible evidence may be material
> if it could have led to the discovery of admissible evidence. . . . Furthermore, . . .
> we think that inadmissible evidence may be material if it could have been used
> effectively to impeach or corral witnesses during cross examination.

Johnson, 705 F.3d at 129-130. The Third Circuit instructed the district court, on remand, to

"evaluate the materiality of each item of suppressed evidence individually, bearing in mind not

only its content, but also where it might have led the defense in its efforts to undermine Robles."

Id. at 131. In addition, the court emphasized that lower courts "must consider the cumulative

effect of all the evidence that was suppressed and favorable to [petitioner]." Id. (citing Smith v.

Sec'y, Dep't of Corr., 527 F.3d 1327, 1346 (11th Cir. 2009) ("Cumulative analysis of the force

and effect of the undisclosed pieces of favorable evidence matters because the sum of the parts

almost invariably will be greater than any individual part.")).

Although the court did not decide the ultimate question of whether the withheld evidence

about Robles constituted Brady material that would entitle the petitioner to a new trial, it

characterized the evidence as "substantial impeachment evidence." It advised the district court to

carefully "consider all paths to materiality discussed above, in addition to any others that

[petitioner] can identify." Id. at 132. The district court must address this ultimate question: "In light of this newly disclosed evidence, and the relative paucity of other evidence connecting [petitioner] to the murder…, could confidence in the verdict be undermined?" Id.

Following the Third Circuit's instruction, I will examine the most salient pieces of evidence individually before looking at the cumulative effect of all the police reports, beginning with the February 1996 shooting incident. Pet. Ex. 21, Doc. No. 55. Robles was questioned by police after allegedly pulling a gun on someone and threatening to kill him. The officers reported that another witness accused Robles of pointing his gun to another woman's head as well. In denying the allegations, Robles told the investigator, Cabrera, that he had information about a murder that he would reveal in confidence. The police report notes that "there is enough to make an arrest," but the case was closed because the victims refused to file. This evidence shows Robles' willingness to provide police with information when he was confronted with his own misdeeds. Bridges could have used this police report to question Robles about his testimony in Bridges' trial, and whether it was similarly offered as a way to curry favor with the police. Bridges could have also used the police report to ask Robles about whether he lied to the police when he said he did not pull a gun on the victim.

Similarly, the police documents relating to the April 1996 shooting incident would have allowed Bridges to inquire into Robles' bias toward the prosecution. Police responded to reports of shots fired, and found that 11 bullets had hit the house that was rented at the time by Robles. During the investigation of that incident, police found a cigar box with Robles' fingerprint that contained drugs inside. Additionally, multiple witnesses told the police that Robles was a drug dealer. One explained that Robles had stashed a safe at her house, and another told police that Robles kept the crack he sold, along with a gun, in the safe. Once again, Robles was not arrested

26

or charged with a crime.

Each of these reports individually would have provided Bridges an opportunity to inquire about Robles' bias or motive to lie, as each incident shows police officers who have reason to suspect that Robles was involved in criminal activity but who do not arrest or charge Robles. Robles' eagerness to provide information after the February shooting gives further ammunition to Bridges' theory that Robles was lying to the police—then and during his own trial—in order to curry their favor and protect his own criminal interests. Each of these police reports would have allowed Bridges to question Robles' motivation.

However, I need not determine whether the suppression of each report, on its own, undermines confidence in the trial, because the cumulative prejudicial effect of the numerous suppressed police reports about Robles shows that they are "material" under Brady. Robles' testimony constituted the only evidence that the prosecution presented to show that Bridges had the intent to kill—the necessary mens rea for first degree murder. Therefore, "the pivotal factor in the…trial was the credibility of the prosecution's chief witness." Com. v. Birch, 616 A.2d 977, 979 (Pa. 1992). Recognizing this, the District Attorney repeatedly emphasized Robles' trustworthiness. In his closing argument, the prosecutor asked the jury what Robles could possibly be gaining out of testifying, describing Robles as a reluctant witness: "George Robles didn't want to come in here, but George Robles came to court and told you what he knew about this case. . . . Would he make up this story?" N.T. Vol. V 1383. The defense attempted to poke holes in Robles' testimony during cross examination and closing arguments, but without the police reports, Bridges could not ask Robles about his motivation to testify. He could not ask the jury to consider why it was that Robles was known by the police to be a drug dealer, and to have been present at multiple shooting incidents, and yet had never been arrested or charged with a

crime. Without the Brady material, Bridges could not counter the prosecution's claim that Robles had nothing to gain from cooperating with the police. Fundamentally, he could not meaningfully challenge the presentation of Robles as a trustworthy witness who should be believed. Considering the centrality of Robles' testimony to the Commonwealth's case, this information gap resulted in a serious disadvantage to Bridges.

Moreover, the police documents could have led Bridges' attorneys to other witnesses who could have testified about Robles' activities and his character. The Third Circuit, in Johnson, held that evidence that could lead to other impeaching or exculpatory evidence that could have changed the outcome of the trial would itself be Brady material. The Johnson court noted that cross-examination of Robles could have looked very different had this evidence been disclosed:

> For example, Johnson could have cross-examined Robles about specific instances in which he was approached as a person of interest in several felonies. If, in the face of these pointed questions, Robles still maintained that he was a law-abiding citizen without a motivation to manufacture testimony against Johnson, Johnson suggests that he could have called police officers to testify that Robles was aware that he was under investigation . . . . Furthermore, Johnson urges that the District Attorney would not have been able to discount Johnson's attack on Robles's credibility in his closing argument had Johnson had access to all of the impeachment evidence in the possession of the Commonwealth.

Johnson, at 130. The arguments Johnson presented apply with equal force to Bridges: With this evidence, Bridges could have cross-examined Robles more fully and effectively; he could have called additional witnesses to testify about Robles' possible bias; and the Commonwealth would not have been able to brush aside Bridges' arguments about Robles' credibility so easily.

There is a reasonable probability that, had this evidence been disclosed, Bridges would not have been convicted of first degree murder. The prosecution charged him only as an accomplice, and Robles' testimony was the only evidence that pointed to Bridges' own intent to

kill, a necessary element of first degree murder. Bridges' statement to the police, which was read to the jury, N.T. Vol. IV 1030, explained that he had not shot nor had he intended to shoot anyone, and had no idea that Johnson had planned to start shooting in the van. Bridges said that he grabbed a gun in the scuffle and fired in Johnson's direction in an attempt to get Johnson to stop shooting. Robles' testimony that Bridges had said he wanted to kill the Banks cousins was the only direct evidence the Commonwealth presented relevant to Bridges' intent to kill. As Bridges' attorneys revealed during cross examination, Robles' story as to Bridges' statements changed many times. In fact, Robles had never told the police in any of his many interviews that Bridges had said he intended to kill the Banks cousins. Bridges' lawyers attacked Robles' credibility as robustly as they could have. But without the police records demonstrating the likelihood that Robles was a drug dealer with an interest in currying favor with the police, Bridges could not fully impeach Robles. If the Commonwealth had not improperly withheld the numerous documents in its possession relating to Robles, there is a reasonable probability that the jury would have disbelieved Robles' testimony.

The evidence was favorable to Bridges, withheld by the prosecution, and material. The Commonwealth's failure to disclose it prejudiced Bridges. As the Third Circuit directed in Johnson, I must ask myself, "In light of this newly disclosed evidence, and the relative paucity of other evidence connecting [petitioner] to the murder…, could confidence in the verdict be undermined?" Johnson, at 132. These violations of Brady v. Maryland undermine confidence in Bridges' verdict. He is therefore entitled to habeas relief, and a new trial.

## C.   Ineffective Assistance of Counsel

### 1.   Exhaustion

In Claim IV, Bridges argues that his counsel was ineffective during the penalty phase of

the trial for failing to investigate, develop, or present mitigating evidence. Third Am. Pet. 79, 84-85. The factual and legal substance of this claim was fairly presented to the Pennsylvania Supreme Court during Bridges' first PCRA proceeding. See Commonwealth v. Bridges ("Bridges II"), 886 A.2d 1127, 1132-33 (Pa. 2005) (holding that trial counsel's performance at sentencing was not deficient); cf. id. at 1134-35 (Saylor, J., concurring) (finding that trial counsel's performance at sentencing was deficient but that Bridges failed to show sufficient prejudice to warrant relief).[7]

### 2. Merits Discussion

In Claim IV of Bridges' Third Amended Petition, Bridges argues that his counsel provided ineffective assistance during the penalty phase of his trial by failing to investigate, develop, and present mitigating evidence.  Third Am. Pet. 79.  This claim was the centerpiece of his first PCRA petition.  After an evidentiary hearing, the PCRA court denied relief, and a divided Pennsylvania Supreme Court affirmed.  See Bridges II, 886 A.2d at 1132-33 (holding that counsel's performance was adequate and that counsel's apparent failure not to further investigate Bridges' childhood was "a reasonable strategic decision"); id. at 1134-35 (Saylor, J., concurring) (finding that counsel was deficient but that Bridges suffered no prejudice as a result). The ineffective-assistance claim was adjudicated on the merits.

---

[7] Notwithstanding the Pennsylvania Supreme Court's discussion of this claim in Bridges II, the Commonwealth argues that the exhaustion requirement was not met. Commw. Mem. 12. In the Commonwealth's view, Bridges' PCRA claim was that counsel was ineffective for "failing to obtain the services of a mitigation expert and for failing to present certain evidence to the jury," while his federal claim is that counsel was ineffective for "failing to properly argue the case for life." Id. This is a distinction without a difference. The petitioner's reference to "arguing the case for life" is merely a term of art for the presentation of mitigating evidence during the punishment phase of a capital trial. See, e.g., Marshall v. Hendricks, 307 F.3d 36, 103 (3d Cir. 2002) (describing capital counsel's duty to "make a case for life" during the penalty hearing). Claim IV was fairly presented to the state courts.

At the penalty phase, the Commonwealth charged two aggravating factors: (i) that Bridges had been convicted of two murders; and (2) that the murder was committed in relation to drug trafficking.[8] The defense put forward four mitigating factors: (1) that Bridges acted under the influence of extreme emotional disturbance; (2) that he was only 19 at the time of the crime; (3) that his participation in the homicide was relatively minor; and (4) the catch-all mitigating factor.[9] Bridges' lawyer presented thirteen witnesses, nearly all of them family or acquaintances, who generally reported that Bridges was a good man who did not deserve to die. The defense presented no specific evidence demonstrating Bridges' extreme emotional distress, and discussed Bridges' relatively minor role in the homicide only in the closing argument. The defense never had an expert evaluate Bridges and presented no expert testimony, nor did the lawyer conduct an

---

[8] Pennsylvania law specifies eighteen possible aggravating circumstances that could make a defendant eligible for the death penalty. 42 Pa. Cons. Stat. Ann. § 9711(d). Bridges was charged under two of them, found in § 9711(d)(11) and (14):

(11) The defendant has been convicted of another murder committed in any jurisdiction and committed either before or at the time of the offense at issue.

[…]

(14) At the time of the killing, the victim was or had been involved, associated or in competition with the defendant in the sale, manufacture, distribution or delivery of any controlled substance or counterfeit controlled substance in violation of The Controlled Substance, Drug, Device and Cosmetic Act or similar law of any other state, the District of Columbia or the United States, and the defendant committed the killing or was an accomplice to the killing as defined in 18 Pa. Cons. Stat. Ann. § 306(c), and the killing resulted from or was related to that association, involvement or competition to promote the defendant's activities in selling, manufacturing, distributing or delivering controlled substances or counterfeit controlled substances.

[9] Pennsylvania law lists seven specific mitigating factors and one catch-all mitigator. 42 Pa. Cons. Stat. Ann. § 9711(e). The four factors presented to Bridges' jury were § 9711(e)(2), (4), (7), and (8):

(2) The defendant was under the influence of extreme mental or emotional disturbance.

[…]

(4) The age of the defendant at the time of the crime.

[…]

(7) The defendant's participation in the homicidal act was relatively minor.

(8) Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.

investigation into Bridges' life history. After deliberating for more than six hours, and after

telling the court at one point that it was deadlocked, the jury eventually returned a verdict of

death, finding only one aggravating factor (the multiple homicide factor) and no mitigating

factors.

Under the Sixth and Fourteenth Amendments, a criminal defendant has the right to

effective assistance of counsel, which is violated if the attorney's performance falls "below an

objective standard of reasonableness" and "the petitioner suffer[s] prejudice as a result of the

deficiency." Blystone, 664 F.3d at 418 (citing Strickland v. Washington, 466 U.S. 668, 687

(1984)). Once a Strickland claim has already been adjudicated on the merits by the state court, a

habeas petitioner has the additional burden of showing that the state court's decision about the

reasonableness of counsel's performance was itself unreasonable. Id. "The standards created by

Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review

is doubly so." Harrington, 131 S. Ct. at 788. "[S]trategic choices made after thorough

investigation of law and facts relevant to plausible options are virtually unchallengeable."

Strickland, 466 U.S. at 690.

A successful claim of ineffective assistance of counsel requires proving both deficient

performance and prejudice. In its examination of Strickland's two prongs, the Pennsylvania

Supreme Court correctly identified the governing standard relating to deficient performance, but

used the wrong standard for determining whether the defendant had been prejudiced. Therefore,

while our review of the court's determination of deficient performance must apply § 2254(d)

deference, our review of the prejudice prong is de novo. See Terry Williams, 529 U.S. at 405-06

(explaining that where a state court applies the wrong federal standard, the federal court is

"unconstrained" by § 2254(d)(1)).

I find that Bridges' lawyer performed deficiently, and that the state court's finding otherwise was an unreasonable application of federal law. Further, Bridges suffered prejudice from his lawyer's poor performance. Therefore, Bridges is entitled to habeas relief.

### a. Deficient Performance

To establish ineffectiveness, a "defendant must show that counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. The Supreme Court explained a lawyer's duty to investigate and the deference owed to decisions surrounding that investigation:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Id. at 690-91. The relevant inquiry here "is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [Bridges'] background was itself reasonable." Wiggins v. Smith, 539 U.S. 510, 523 (2003).

After properly identifying the Strickland standard, the Pennsylvania Supreme Court held that Bridges' lawyer had not performed deficiently. The court distinguished Wiggins, holding that Bridges "was unable to show trial counsel failed to properly investigate and present mitigating evidence because counsel did not have information relating to [Bridges'] childhood that should have led to further investigation." See Bridges II, 886 A.2d 1127, 1133 (Pa. 2005). The court found that counsel "made a reasonable strategic decision concerning what information

33

to investigate and what to present as mitigating evidence" Id. Because the state court ruled on the merits and applied the appropriate federal law, Bridges can prevail on this claim only if he demonstrates that the state court's determination was "contrary to, or an unreasonable application of" Strickland, or that it rested "on an unreasonable determination of the facts in light of the evidence presented to the State court proceeding." 28 U.S.C. § 2254(d)(1).

During the penalty phase, the Commonwealth presented only one witness, Robles, who testified about Bridges' drug activity. N.T. Vol. VII, 1498-1536. Bridges' lawyer, Peter David Maynard, presented thirteen witnesses, nearly all of them family members or acquaintances, who spoke in general terms about Bridges' good character and asked the jury to spare his life. Id. at 1537-1623.[10] Bridges' mother's brief testimony—comprising only two pages of transcript— simply described her son as "a good boy" and proclaimed his innocence. Id. at 1545-47. Bridges' father provided a somewhat more detailed description of Bridges' childhood, mentioning Bridges' health problems that required regular visits to the hospital, but generally painted a positive picture of their family life. Id. at 1609-1618. He stated that his son and his family "were all kind of like a real close family type person," and asked the jury to spare Bridges' life. Id. at1614-15.

Maynard presented nothing beyond these generalized statements of Bridges' character. Despite the fact that the court approved funding for Maynard to hire a psychologist to assist with the penalty phase, N.T. Omnibus Pretrial Hearing 15, he never engaged an expert to evaluate Bridges, nor did he present any expert testimony whatsoever at sentencing. The entire penalty

---

[10] Maynard asked each witness whether Bridges was known to use or sell drugs or to possess a gun, which allowed the prosecution, on cross examination, to present evidence of Bridges' juvenile charges of weapon possession and carrying a firearm without a license. N.T. Vol. VII 1555-56.

phase lasted only three hours. Thus, Maynard never presented any specific testimony that would have helped to prove any of the mitigating factors he argued; in closing, he simply told the jury, "there is more to this man that what you heard in this case." Id. at 1647.

Despite its availability, Maynard presented absolutely no evidence whatsoever that would have enabled the jury to learn what "more" there was to Bridges. Maynard admitted that he undertook "[n]o specific investigation" into Bridges' childhood or upbringing. N.T. PCRA Hearing 5:16-6:2, No. 117-97 (C.P. Berks County, April 26, 2004) ("PCRA Hearing I"). He admitted that he failed to retain an expert of any kind for the penalty phase, id. at 12:1-3, including an expert who would have discussed the effects of Bridges' childhood illness on his behavior. Id. at 11:1-5. He explained that his decision not to retain any expert was because he "didn't see that much evidence in terms of psychological disturbance," id. at 17:10-11, despite the fact that he had asked the jury to find, as a mitigating circumstance, that Bridges acted under extreme emotional disturbance. Importantly, Maynard made it clear that his failure to fully investigate Bridges' life history and to present a robust mitigation case was not a strategic decision: He testified that he understood that, as a defense lawyer in a death penalty case, "You put everything in. . . . [A]s a practical matter in a death penalty case, in hindsight, everything should have come in. . . . In retrospect and hindsight I would have used everything." Id. at 14:7-13, 16:21-22.

Maynard's investigation constituted deficient performance under Strickland. As the United States Supreme Court declared in respect to a death penalty trial that occurred in 1988, eight years before Bridges' trial, "It is unquestioned that under prevailing professional norms at the time . . . counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'" Porter v. McCollum, 130 S. Ct. 447, 452 (2009) (per curiam) (quoting Terry

Williams, 529 U.S. at 396).

      Maynard's conduct fell far short of the standards established by the American Bar

Association (ABA) for capital defense attorneys. The United States Supreme Court frequently

cites ABA standards in its discussions of the reasonableness of a lawyer's performance. See, e.g.,

Wiggins, 539 U.S. at 524 (explaining the Court has "long referred" to ABA standards "as guides

to determining what is reasonable") (internal quotation omitted); Terry Williams, 529 U.S. at

396; Rompilla v. Beard, 545 U.S. 374, 387 (2005). The ABA guidelines in force at the time of

Bridges' trial advised lawyers to begin investigations relevant to sentencing immediately, and

stressed that such an investigation "should comprise efforts to discover all reasonably available

mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by

the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death

Penalty Cases (hereinafter "Guidelines") 11.4.1(C) (1989). The Guidelines advised counsel to

investigate the client's medical history, educational history, and family and social history, among

other areas. Guidelines 11.4.1(D). The Guidelines also advised counsel to secure expert

assistance for the investigation and presentation of mitigation evidence, Guidelines

11.4.1(D)(7)(D), and recommended that lawyers use expert witnesses "to provide medical,

psychological, sociological or other explanations for the offense(s) for which the client is being

sentenced." Guidelines 11.8.3(F)(2). Indeed, the Guideline commentary conveyed the potential

importance of experts: "The assistance of one or more experts (e.g. social worker, psychologist,

psychiatrist, investigator, etc.) may be determinative as to outcome." Commentary, Guideline

11.8.6. The Guidelines emphasized that counsel had a duty to present "all reasonably available

evidence in mitigation unless there are strong strategic reasons to forego some portion of such

evidence," Guidelines 11.8.6(A) (emphasis added), and that such a presentation should include

medical history, family and social history, and expert testimony. Guidelines 11.8.6(B).

Maynard's paltry investigation, by his own admission, failed to meet these standards. A thorough investigation would have uncovered compelling mitigation from Bridges' childhood that would have helped the jury to "see the client as someone they do not want to kill." Commentary, Guidelines 11.8.6. During his first PCRA proceedings, Bridges' PCRA lawyer finally exposed the true story of Bridges' life during the 19 years that preceded the trial, in an extensive mitigation report that revealed a much fuller picture of Bridges' troubled childhood. First Amended PCRA Brief, Dec. 15, 2003, Ex. C, Mitigation Report by Louise Luck, M.A., Dec. 10, 2003 (hereinafter "Mitigation Report"). Bridges was raised in an unstable home by a single mother who was addicted to crack, and he "swung between the relative structure of his father's home and the chaotic life he shared with his mother." Mitigation Report at 11. Bridges' mother, Joycetine, had grown up with a heroin-addicted stepfather after her biological father— whom Joycetine's mother described as an alcoholic womanizer—was shot and killed. Id. at 16-17. She and her siblings all developed drug or alcohol addictions. Id. at 19. Joycetine met Bridges' father, Michael, in high school, and she gave birth to Bridges when she was eighteen. Id. at 17.

Michael lived with Joycetine and Bridges for only a few months after Bridges was born; subsequently, Joycetine had primary custody, and she and her children moved frequently. Id. at 12. Bridges attended three elementary schools in his first three years of education. Id. at 11. In between apartments, they would frequently return to Bridges' grandmother's or aunt's house, where Bridges would share a bed with his cousins. Id. at 12. Joycetine would often disappear for two or three weeks at a time, leaving Bridges in the care of his grandmother or his aunt. Id. at 18. Bridges' father suspected Joycetine of engaging in prostitution to support her drug habit; the

Mitigation Report notes that she was "known on the streets of Reading for prostitution and substance abuse." Id. at 12. Joycetine's crack addition was debilitating. Hospital records show that she tested positive for cocaine while pregnant with one of Bridges' siblings, and Joycetine gave up another of Bridges' siblings for adoption, in part due to her addiction. Id. at 20. Joycetine and her children were on food stamps and welfare for much of Bridges' childhood. Id. at 20.

    Many of Joycetine's boyfriends were drug users or drug dealers, and many of them beat her in front of Bridges. Id. at 18. One boyfriend, who taught Bridges about drug dealing and "street life" when he was a young teen, was particularly violent; Bridges recalls coming home to find blood all over the house after a fight between him and Joycetine. Id. Joycetine made frequent visits to the hospital due to physical injuries that were most likely from abuse, although only one admission was specifically tied to domestic assault. Id. at 19.

    Bridges himself suffered debilitating illness and hospitalizations as a child, of which Maynard was generally aware but failed to investigate or explore in depth. In 1988, when Bridges was in fifth grade, he was rushed to the hospital with severe groin and leg pain. Id. at 21. He was diagnosed with acute rheumatic fever and anemia. A year later, he battled a second round of rheumatic fever. His treating physician demanded that he remain on bed rest and use a wheelchair, and urged the family admit to Bridges to a chronic care hospital. Id. Instead, the family took Bridges home. Id. During this time, hospital records show that Bridges' physicians were concerned about his anxiety and depression stemming from his bed rest and from observing the sudden death of a close friend in the hospital. Id. The doctors noted that Bridges, who endured this illness between the ages of 12 and 14, spent many nights in the hospital completely alone, without a single family visitor. Id.

Rheumatic fever is associated with untreated strep throat, and thus can be a sign of neglect. Id. If left untreated, it can damage the heart valves—precisely what happened to Bridges, who was forced at age 17 to undergo open-heart surgery. His mother never visited him in the hospital during his surgery or recovery. Id. at 22.

Throughout his illness, Bridges was forced to spend much of his time in a wheelchair, and missed significant amounts of school. Given the seriousness of his condition, he received disability up until the time of his incarceration. Id.

Maynard never investigated this serious illness, despite his knowledge of its general contours. Without investigation and the assistance of an expert, he failed to show the jury the link between the illness and childhood neglect. He failed to explore Joycetine's addiction, and did not ask her a single question about Bridges' childhood or her experience as a mother when he called her to testify during the penalty phase. He failed to present hospital records that recorded Bridges' anxiety and depression, that noted Bridges' deteriorating dental health, and that showed doctors pleading with Bridges' family to take his illness seriously and get him the help he needed. Maynard never investigated Bridges' chaotic home life, or the effect that such radical and irregular swings between the neglect of his mother's family and rigid rules of his father's family may have had on his development. Maynard never investigated the developmental effect of witnessing domestic abuse, or how it could have enhanced his sense of protectiveness over his home and family, which may have contributed to the crime.[11]

Maynard's utter failure to investigate Bridges' upbringing constituted deficient performance under the Sixth Amendment, and the state court's opposite conclusion constituted

---

[11] The day before the murders, two masked people entered Bridges' home and robbed it while holding his girlfriend at gunpoint. Bridges believed that the Banks cousins were the perpetrators. N.T. Vol. IV 1029.

an unreasonable application of federal law. The PCRA found that Bridges had failed to show that
Maynard, unlike the lawyer in Wiggins, had information relating to Bridges' childhood "that
should have led to further investigation." Commonwealth v. Bridges, No. 117-97 at *3 (C.P.
Berks County, May 19, 2004). The court stated that Maynard's discussions with Bridges,
through which he "got general information about [Bridges'] background," were sufficient to
allow him to make "a strategic decision as to what to investigate and include as mitigation." Id.
The Pennsylvania Supreme Court affirmed: "Unlike in Wiggins, however, in this case, the court
found appellant was unable to show trial counsel failed to properly investigate and present
mitigating evidence because counsel did not have information relating to appellant's childhood
that should have led to further investigation." Bridges II, 886 A.2d at 1133.[12] Further, the court
held, Bridges' trial counsel "made a reasonable strategic decision concerning what information
to investigate and what to present as mitigating evidence." Id.

In finding that Maynard had met his constitutional obligations, the state court
unreasonably applied clear federal law as stated by the Supreme Court. First, it is simply not the
case that the lawyer's duty to investigate begins and ends with discussions with his client. Even a
"fatalistic and uncooperative" client does not absolve a lawyer from independent investigation.
See Porter, 130 S. Ct. at 453. As the Third Circuit explained, it is not the duty of the defendant to
provide information on mitigation to the lawyer; rather, it is the lawyer's duty to uncover it:

> Counsel's failure to think ahead caused them to fail to inquire meaningfully into
> Bond's childhood and mental health. They did not obtain readily available school
> records portraying a much troubled youth. Nor did they seek medical records or
> conduct a meaningful inquiry into Bond's family life. . . . We will not excuse this
> conduct on the ground that Bond and his family members did not tell counsel that

---

[12] Seemingly out of nowhere, the court also pronounced that Maynard "presented mitigating
evidence regarding appellant's background," without pointing to any such evidence. Bridges II at
1133.

40

his background provided fertile territory for mitigation arguments. <u>Neither Bond nor his family had a duty to instruct counsel how to perform such a basic element of competent representation as the inquiry into a defendant's background</u>. They did not, as the Commonwealth suggests, have to volunteer 'red flags' about Bond's mental health when trial counsel should have discovered that information through a basic inquiry into his background.

<u>Bond v. Beard</u>, 539 F.3d 256, 288 (3d Cir. 2008) (emphasis added).

The state court is incorrect in suggesting that, under <u>Wiggins</u>, a lawyer is only obligated to investigate areas of mitigation of which he has knowledge already. The Supreme Court has specifically rebuked lawyers for "ignor[ing] pertinent avenues for investigation of which he <u>should</u> have been aware." <u>Porter</u>, 130 S. Ct. at 453 (emphasis added). "<u>Strickland</u> does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy." <u>Wiggins</u>, 539 U.S. at 527. The lawyer in <u>Wiggins</u> was found ineffective for failing to expand his investigation beyond the presentence report and the Baltimore Department of Social Services records. The Court determined that the lawyer's decision not to investigate beyond these records was objectively unreasonable in itself—regardless of what evidence he already had in his possession—by pointing to the ABA Guidelines and standard practice that imposed a duty to discover all reasonably available mitigating evidence. <u>Id</u>. at 524. The Court found that the scope of the investigation was "<u>also</u>" unreasonable "in light of what counsel actually discovered" in the social service records. <u>Id</u>. at 525 (emphasis added). In other words, it was not <u>only</u> the fact that the lawyer was made aware of potential lines of mitigation from the social service records; rather, he had an affirmative duty to discover <u>all</u> avenues of mitigation that were reasonably available.

Moreover, even if the state court's characterization of the <u>Wiggins</u> rule were accurate,

there was plenty of evidence of which Maynard was already aware that should have triggered a wider investigation. First and most importantly, Maynard <u>was</u> aware of Bridges' health problems. He testified that he discussed Bridges' health with his client, N.T. PCRA Hearing I 6:3, and during the penalty phase, Maynard tried to ask various witnesses questions about Bridges' illness. N.T. Vol. VII 1564, 1572-75, 1613. Clearly, Maynard knew that Bridges had suffered a serious illness, and that knowledge should have prompted further investigation, which would have revealed the debilitating nature of Bridges' rheumatic fever, the heart surgery he was forced to undergo, and the trauma of being confined to a wheelchair and being left alone in the hospital for many nights—not to mention the neglect that could have been the cause of Bridges' illness and/or its progression.

In addition, Maynard testified that he had knowledge about Bridges' upbringing in terms of his being left with his grandmother for extended periods of time. But he never followed up with further investigation that would have uncovered his mother's crack addiction, her lack of stable housing for Bridges, her dependence on public assistance, or her abusive and drug-addicted boyfriends. He never investigated Bridges' mother's health records, which would have revealed her history with domestic violence as well as the extent of her crack addiction.

Finally, it is important to re-emphasize that Maynard had access to funds to hire a psychologist or psychiatrist to assist with the penalty phase investigation. In the motion requesting such funding, defense counsel argued that an expert who is familiar with forensic psychology "will be vital to the proper presentation of mitigating factors to the jury," and that denial of such funds would violate Bridges' Equal Protection and Due Process rights. Omnibus Pre-Trial Motion for Relief at 21, No. 117-97 Docket No. 18-A (C.P. Berks County). Despite such assertions, and despite the prevailing ABA Guidelines that advised capital counsel to

consult with experts immediately, Maynard never consulted or retained an expert in connection with penalty phase mitigation.

Maynard's decision to ignore the evidence and funding he had available to him and limit his investigation was objectively unreasonable and fell below prevailing standards at the time of trial. For example, the Third Circuit determined, with respect to a 1993 Pennsylvania trial, "The failure to perform a meaningful investigation violates prevailing professional norms as stated in the American Bar Association's Guideline for Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guideline") 11.4.1." Bond, 539 F.3d at 288 (finding deficient performance at sentencing phase where lawyer failed to "inquire meaningfully into [defendant's] childhood and mental health). See also Outten v. Kearney, 464 F.3d 401, 418 (3d Cir. 2006) ("It was standard practice at the time of Outten's trial [in 1993 in Delaware] for a death-eligible defendant's penalty-phase investigation to include his medical history, educational history, family and social history, employment history, and adult and juvenile correctional records."); Jermyn v. Horn, 266 F.3d 257, 308 (3d Cir. 2001) (for Pennsylvania capital trial in 1985, counsel's "bare bones effort" that presented to the jury V.A. records containing a reference to defendant's childhood abuse fell below the standards required for reasonable representation); Kindler v. Horn, 542 F.3d 70 (3d Cir. 2008) (vacated on other grounds, Beard v. Kindler, 558 U.S. 53 (2009)) (a lawyer performed deficiently in a 1984 Pennsylvania capital trial when he failed to obtain school, medical, or other records; failed to discuss defendant's background with his family, and failed to obtain any mental health evaluation of defendant).

Given this precedent, along with clear Supreme Court instruction in Wiggins, Terry

Williams, and Porter,[13] the Pennsylvania Supreme Court's finding of acceptable performance was an unreasonable application of federal law.

### b. Prejudice

Because I find that Bridges' lawyer was deficient, I will move to the second prong of the Strickland standard and determine whether that deficient performance prejudiced Bridges. To establish prejudice under Strickland, Bridges must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. Under Pennsylvania law, a crime is only eligible for the death penalty if the sentencing jury first finds, unanimously and beyond a reasonable doubt, at least one aggravating factor. 42 Pa. Cons. Stat. Ann. § 9711(c)(1)(iii). At that point, the jury considers any mitigating evidence. If the jury finds no mitigation by a preponderance of the evidence, then it must impose a sentence of death. § 9711(c)(iv). If it finds at least one mitigating factor but determines that the aggravation outweighs that mitigation, it must impose a sentence of death. Id. In all other circumstances, however, the jury must impose a sentence of life in prison. Id. In other words, if the jury fails to unanimously agree that the aggravation outweighs the mitigation, a life sentence must be imposed.

Crucially, the jury does not have to be unanimous in finding the existence of a mitigating factor, or that the mitigation outweighs the aggravation. See Mills v. Maryland, 486 U.S. 367

---

[13] Indeed, it is important to note that penalty phase investigations that the Supreme Court has found to be constitutionally inadequate have been in many ways more robust than the investigation Maynard conducted. In Wiggins, counsel arranged for psychological testing of the defendant, and presented testimony from a criminologist who said that inmates serving life sentences tend to adjust well to prison life. In Terry Williams, trial counsel's mitigation presentation included a recorded statement from a psychiatrist. In Porter, the Supreme Court found ineffective assistance even where the defendant had represented himself throughout most of the trial, arguably diminishing stand-by counsel's duty to conduct a full investigation.

(1988) (holding that that jury instructions in a death penalty case that create a "substantial probability" that jurors would erroneously believe that they must unanimously agree on the existence of a mitigating circumstance before considering it in the weighing process violate the Eighth and Fourteenth Amendments to the United States Constitution). See also Commonwealth v. Begley, 780 A.2d 605 (Pa. 2001) (vacating a death sentence upon review of the verdict sheet that asked the jury to list the mitigating circumstances "found by you unanimously"); Commw. v. Billa, 555 A.2d 835, 844 (Pa. 1989) ("There is no question" that an instruction telling the jury it had to be unanimous as to mitigating circumstances "is invalid under Mills"). This means that if a single juror finds that a mitigating factor was proven by a preponderance of the evidence, and also finds that that factor outweighs any aggravating circumstances, then a life sentence must be imposed.

Given this procedure, for a habeas petitioner to prove Strickland's prejudice prong, he must prove a reasonable probability that, absent his attorney's errors, "he would have been able to prove at least one mitigating circumstance by a preponderance of the evidence and that at least one jury member would have concluded that the mitigating circumstance(s) outweighed the aggravating circumstance(s)." Commonwealth v. Ford, 809 A.2d 325, 332 (Pa. 2002). "In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigation." Wiggins, 539 U.S. at 534. The fact that Bridges' attorney presented some testimony during the penalty phase does not foreclose a finding of prejudice, as the U.S. Supreme Court has made clear:

> We have never limited the prejudice inquiry under Strickland to cases in which there
> was only little or no mitigation evidence presented. . . . [W]e . . . have found
> deficiency and prejudice in other cases in which counsel presented what could be
> described as a superficially reasonable mitigation theory during the penalty phase. .
> . . We certainly have never held that counsel's effort to present some mitigation

evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant."

Sears v. Upton, 130 S. Ct. 3529, 3266 (2010) (per curiam).

In its one-sentence assessment of prejudice, the Pennsylvania Supreme Court declared that Bridges "failed to prove the factors counsel was unaware of would have changed the outcome of the penalty phase proceeding." Bridges II, 886 A.2d at 1133. This is the wrong standard, as the United States Supreme Court made clear:

> If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be "diametrically different," "opposite in character or nature," and "mutually opposed" to our clearly established precedent because we held in Strickland that the prisoner need only demonstrate a "reasonable probability that . . . the result of the proceeding would have been different."

Terry Williams, 529 U.S. at 405-06 (quoting Strickland, 466 U.S. at 694) (emphasis added). As such, the state court's determination of prejudice is "contrary to" clearly established federal law and is entitled to no deference under 28 U.S.C. 2254(d).

Maynard's deficient performance left the jury with virtually no evidence they could use to find any of the mitigating factors presented. An effective mitigation presentation would have told the jury that Bridges grew up in a chaotic household surrounded by drug addicts and abusers. It would have shown Bridges to be a fiercely protective son who was often left for weeks at a time with his relatives. It would have revealed to the jury that Bridges had suffered a serious and debilitating illness during the formative years of his young adolescence—an illness often linked to neglect and that likely could have been prevented or at least mitigated by proper treatment. The jury would have learned that Bridges' condition deteriorated to the point where he was wheelchair-bound and forced to undergo open-heart surgery, just two years prior to his

46

involvement in the crime. And they would have heard how his mother left him completely alone during all his nights in the hospital, never once visiting him.

This evidence would not excuse Bridges' crime, but it would have provided context for it. See Kindler, 542 F.3d at 86 (mitigation evidence "might well have been accepted as explaining (though certainly not excusing)" the crime). For example, Maynard asked the jury to find as a mitigating circumstance that Bridges had acted under extreme emotional distress, but he provided no evidence or testimony during sentencing that would have supported such a finding. A proper life history, however, would have helped the jury see that Bridges' witnessing of the abuse of his mother could have spurred a strong sense of over-protectiveness of his girlfriend that could have explained his violent reaction to the robbery that preceded the murders. Additionally, a full mitigation presentation would have shown the chaotic and unstable home in which Bridges was raised, one that exposed him at an early age to drug use and physical abuse. This evidence could well have convinced the jury that Bridges was less culpable for his criminal behavior. His experience with illness would have revealed the extent of the neglect Bridges suffered, which may have similarly convinced the jury he was less criminally culpable and less deserving of the death penalty. There is a reasonable probability that this strong evidence—none of which was fully investigated or presented to the jury—would have convinced a juror to find the existence of the catch-all mitigating circumstance and determine that the mitigation outweighed the aggravation, compelling the rejection of the death penalty.

The relative weakness of the aggravation adds to the probability that the jury would have returned a different sentencing decision had Bridges' lawyer completed an adequate investigation and presentation. See Porter, 130 S. Ct. at 454 (noting that only one aggravating factor was in play and concluding, "Had the jury been able to place Porter's life history on the

mitigating side of the scale . . . there is clearly a reasonable probability that the advisory jury would have struck a different balance") (internal quotation marks omitted).

Moreover, even without the meaningful evidence of mitigation that should have been but was not presented, the jury struggled mightily with its sentencing decision. After it had deliberated for roughly four hours, during which time it had asked the court for further explanation of one of the mitigating circumstances, the jury reported that it was deadlocked. Judge Keller sent the jury home for the evening. When the trial reconvened the next morning, he instructed the jury to review the arguments "and see if you cannot, upon further deliberations, after having a good night's sleep, arrive at unanimous verdicts." N.T. Vol. VII 1672. Only after another two hours of deliberation and a new round of questions to the court regarding the weighing of aggravation and mitigation did the jury return a sentence of death. Here, the jury rejected the prosecution's theory of the case—that it was related to drug trafficking—when it rejected the aggravating factor relating to the drug trade. It found only one aggravator, that Bridges had been convicted of more than one homicide. Given that the trial was for the death of two victims, the defense could not even dispute this factor.

Indeed, the record suggests that the jury may have been confused about whether they had to be unanimous in finding the existence of a mitigating factor. After the jury reported that it was deadlocked, the court sent the jurors back for further deliberations, instructing them to try to "arrive at unanimous verdicts on the penalties. Unanimous verdicts as to the death penalty or as to life imprisonment." N.T. Vol. VII 1671-72. As explained above, in Pennsylvania, a capital jury does not have to be unanimous with respect to a sentence of life imprisonment: If a jury fails to unanimously agree to a death sentence, then a sentence of life is automatically entered. See 42 Pa. Cons. Stat. Ann. § 9711(c)(iv).

48

Given these circumstances, particularly the deadlocked jury, See Com. v. Ford, 809 A.3d 325, 334 (Pa. 2002) (making note of the deadlocked jury in finding the existence of prejudice), I cannot say that there is no reasonable probability that the outcome would have been different had Maynard presented a constitutionally adequate case for mitigation. "[T]he mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of [defendant's] moral culpability." Wiggins, 539 U.S. at 538 (internal quotation marks omitted).

Because it is reasonably probable that an effective presentation of the available mitigating evidence would have convinced at least one juror to find that the mitigation outweighed the aggravation, I conclude that Bridges was denied the effective assistance of counsel at the penalty phase guaranteed to him by the Sixth Amendment. Accordingly, he is entitled to a new sentencing determination.

* * * * *

Bridges' petition contained numerous other claims. For the reasons below, I find no basis for relief on those claims. I will begin with a discussion of which claims are exhausted, followed by an examination defaulted claims. Finally, I will address the remaining claims on the merits.

## II. DISCUSSION OF OTHER CLAIMS

Bridges' third amended habeas petition contains numerous claims grouped under separate topical headings. Exhaustion of each of these claims will be considered in turn.

### A.   Relevant Legal Standards

The standards for exhaustion and AEDPA deference have been explained above. See supra pp. 2-8. For the remaining claims, the standards relating to procedural default are also relevant, and thus will be explained below.

#### 1.  Procedural Default

Determining whether a claim has been exhausted does not end the inquiry into which claims can be properly considered by this Court. A claim that has technically been exhausted may still have been procedurally defaulted in state court, and thus cannot be heard by this court unless the petitioner establishes cause for the default and prejudice by its application. Similarly, a claim that was not exhausted in state court may still be heard by this Court if the petitioner can show cause and prejudice.

A claim is procedurally defaulted when the petitioner failed to follow a state procedural rule at trial, on appeal, or during post-conviction proceedings, such that the state refused to hear the claim. Coleman v. Thompson, 501 U.S. 722, 729-30 (1963). Additionally, a claim maybe procedurally defaulted if the petitioner failed to exhaust the claim in state court and state procedures now prohibit the petitioner from properly presenting the claim in state court. In these circumstances, the state procedural rule operates as an independent and adequate state ground that bars federal habeas relief, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Id. at 750.

For a state procedural rule to bar habeas relief, it must be both independent of federal law and an adequate ground to support the state court's judgment. A state procedural rule is not independent when, for example, it is so "interwoven with federal law" that it cannot be divorced from the merits of the petitioner's claim. Johnson v. Pinchak, 392 F.3d 551, 557 (3d Cir. 2004) (quoting Coleman, 501 U.S. at 740). A state procedural rule is not adequate when, for example, it is only irregularly followed by the state courts. Id. at 558-59; Bank v. Horn, 126 F.3d 206, 211 (3d Cir. 1997).

If the state procedural rule is both independent and adequate, habeas relief is barred

50

unless the petitioner can show cause for the default and prejudice from the alleged constitutional error, or a fundamental miscarriage of justice. Coleman, 501 U.S. at 750. To show cause, the petitioner ordinarily must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray, 477 U.S. at 488. To show prejudice, the petitioner must show that the errors "worked to his actual and substantial disadvantage, inflecting his entire trial with error of constitutional dimensions." Id. at 494 (emphasis omitted) (quoting United States v. Frady, 456 U.S. 152, 170 (1982)). Finally, a fundamental miscarriage of justice occurs only in the "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." Id. at 496; see also Schlup v. Delo, 513 U.S. 298, 316 (1995) (petitioner must present "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial").

The rationale for applying procedural default principles to claims deemed untimely by the state courts is well established. Procedural default is a corollary of exhaustion. "[A] habeas petitioner who has failed to meet the State's requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." Coleman v. Thompson, 501 U.S. 722, 732 (1991).

The rationale for applying procedural default principles to claims that were not presented to the state courts is more complex. The statutory exhaustion requirement applies only to remedies that are "available" at the time of the federal petition. 28 U.S.C. § 2254(b)(1)(A). If the doors of the state courts are now closed to the petitioner because the time for raising the claim in state court has expired, there are no longer any "available" remedies to exhaust. Engle v. Isaac, 456 U.S. 107, 125 n.28 (1982). Further, requiring a habeas petitioner to attempt to exhaust claims in state court when it would be futile to do so would be a pointless waste of both state and

federal judicial resources. <u>See</u> <u>Lines v. Larkin</u>, 208 F.3d 153, 166 (3d Cir. 2000) (habeas court will not require petitioner "to return to an unavailable state forum for nonexistent relief"). Instead of forcing the petitioner to return to state court to present an unexhausted claim only to be told that the claim is defaulted, the habeas court will proceed directly to apply principles of procedural default. <u>Id.</u> "We 'excuse' a failure to exhaust 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law.'" <u>Whitney v. Horn</u>, 280 F.3d 240, 250 (2002) (quoting <u>Gray v. Netherland</u>, 518 U.S. 152, 161 (1996)). But a showing that it would be futile to return to the state court is only the first step. "When exhaustion is futile because state relief is procedurally barred, federal courts may only reach the merits if the petitioner makes the standard showing of 'cause and prejudice' or establishes a fundamental miscarriage of justice." <u>Lines</u>, 208 F.3d at 166. In other words, the federal habeas court will hear a claim that was not exhausted in state courts and has been procedurally defaulted by a state procedural rule only if the petitioner can make a proper showing of cause and prejudice or a fundamental miscarriage of justice.

Because the time for filing a new PCRA petition has long since passed,[14] any claims that

---

[14] Under 42 Pa. Cons. Stat. Ann. § 9545(b), a PCRA petition must be filed within one year of the date that petitioner's conviction becomes final, unless he can prove that:

    (i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;

    (ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or

    (iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

§ 9545(b).

Bridges has failed to exhaust in state court are procedurally defaulted, and can only be considered on the merits if he can show cause and prejudice as explained above. Below, I address each claim in turn. For those that I find to be unexhausted, I address the cause and prejudice standard only where Bridges has raised that excuse to procedural default.

B.    **Claim I: <u>Napue</u>, and Related Claims**

1.    **Claim I.B.2: Reliance on False Testimony**

*Exhaustion*

In Claim I.B.2 of his Third Amended Petition, Bridges argues that the prosecution knew or should have known that portions of George Robles' testimony were false and that the prosecution's reliance on this testimony violated due process under <u>Napue v. Illinois</u>, 360 U.S. 264 (1959), which held that a defendant's right to due process was violated when the prosecution failed to acknowledge or correct the false testimony of one of its witnesses. Third Am. Pet. 55. In particular, Bridges believes that Robles testified falsely when Robles described seeing Bridges with the 9 millimeter Glock and hearing Bridges plan to kill the victims. <u>Id.</u> at 53-56.

In his direct appeal, Bridges argued that the prosecution knew or should have known that these two details of Robles' story (<u>i.e.</u>, seeing the gun and hearing Bridges express an intent to kill the Banks cousins) were false and that this false testimony should not have been admitted or should have been corrected. Direct Appeal Br. 28 (Ex. to Doc. No. 62, at A173, A222). The Pennsylvania Supreme Court's opinion does not expressly discuss this claim in terms of federal due process and refers only to Bridges' alternative argument that admission of Bridges' testimony violated state discovery rules. <u>See</u> <u>Bridges I</u>, 757 A.2d at 874 (holding that admission of Robles' testimony was within trial court's discretion, especially since Bridges' counsel did not object). But the federal character of this claim was fairly presented in Bridges' appellate briefing,

53

which relies on state cases that are themselves applications of the relevant federal standard.

Direct Appeal Br. 28 (citing Commonwealth v. Martinez, 380 A.2d 747, 751 (Pa. 1977) (citing

United States v. Agurs, 427 U.S. 97, 103 (1976))). Thus, Bridges has exhausted the remedies

available in state court for this claim.

***Merits Discussion***

   Like the Brady claim, the Pennsylvania Supreme Court does not appear to have decided

the merits of this Napue claim. Bridges presented this claim during his direct appeal, in which he

also argued that these portions of Robles' trial testimony violated state discovery law. Direct

Appeal Br. 28. The Pennsylvania Supreme Court examined only the latter argument:

> On appeal, Appellant objects to the admission of testimony by
> Commonwealth witness George Robles (Robles). Appellant claims that it
> was error to permit Robles to testify to additional matters not contained in
> discovery material. Specifically Appellant claims that prior to the offer of
> proof made on January 29, 1998, immediately preceding Robles'
> testimony, Robles had told no one that he saw the Appellant pull a black
> Glock 9 mm. handgun from his waistband on December 8, 1996 and
> waive it around Robles' house.
>
> We begin, again, with black letter law. The admissibility of
> evidence is a matter addressed to the sound discretion of the trial court and
> an appellate court may only reverse upon a showing that the trial court
> abused its discretion. No abuse of discretion occurred in this matter
> because, after the offer of proof, Appellant made no objection to the
> admissibility of this evidence. Moreover, Appellant has established no
> prejudice arising from the admission of the evidence and we likewise see
> none. Finally, we note that defense counsel fully cross-examined Robles
> regarding new allegations by Robles, extensively exploring the issue of
> recent fabrication on the part of Robles.

Bridges I, 757 A.2d at 874 (footnote and citations omitted). Because the state courts did not

decide the merits of Bridges' claim that the prosecution knowingly relied on false testimony,

federal habeas review of that legal claim is plenary. Appel, 250 F.3d at 210.

   In Napue v. Illinois, the Supreme Court held that federal due process forbids "a

conviction obtained through use of false evidence, known to be such by representatives of the State." 360 U.S. at 269. "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Id. But to be entitled to relief, the petitioner must show that the perjured testimony was material. "Perjured testimony is material to a conviction if there is any reasonable likelihood that it could have affected the judgment of the jury." United States v. Biberfeld, 957 F.2d 98, 105 (3d Cir. 1992) (citing Napue, 360 U.S. at 271); cf. United States v. Agurs, 427 U.S. 97, 104 (1976) (discussing materiality standard).

The threshold element of this claim is that the testimony at issue was in fact false. Bridges has not demonstrated that Robles testified falsely. Nothing in the undisclosed police reports or in the other materials submitted by the petitioner shows that Robles lied when he recalled seeing Bridges with a 9 millimeter handgun prior to the murders or when he stated that he heard Bridges say that he was "gonna kill" the Banks cousins. N.T. Vol. V 1058-59. The core of Bridges' argument is that Robles must have fabricated these details because they were not present in his several prior statements to the police or in his prior testimony. But that argument was already presented in cross-examination at trial, and it has not been substantially augmented by any of the undisclosed evidence produced in habeas proceedings. See N.T. Vol. V 1064-68 (cross-examination of Robles); see also N.T. Vol. VI 1291-92 (testimony of Criminal Investigator Cabrera that Robles had not previously said that Robles saw Bridges with the 9 millimeter gun prior to the murders). Bridges has not, for example, uncovered any evidence that Robles previously denied seeing Bridges with the handgun or previously denied hearing him express an intent to kill the Banks cousins. Bridges has not shown that the prosecution knew Robles' testimony to be false.

In a somewhat different tack, Bridges argues that Robles' testimony must have been false

because it was conveniently available to buttress the Commonwealth's case. Third Am. 53. Bridges' trial counsel was aware that the prosecution had argued in Roderick Johnson's trial that Bridges had the 9 millimeter gun during the murders—an argument based on Johnson's own inculpatory statements, which were not admitted against Bridges—and trial counsel moved to preclude such argument in Bridges' case, though the motion was withdrawn. N.T. Vol. IV 730; Pet. Ex. 42, Doc. No. 60-2, at 4 (affidavit of trial counsel).[15] Bridges theorizes that the Commonwealth used Robles to fill in a gap in its case caused by the unavailability of Johnson's statements. But the mere fact that Robles' testimony aided the prosecution of Bridges does not itself show that Robles' testimony was false, let alone that the prosecution knew it was false.

Finally, Bridges argues that the prosecution should not have allowed Robles to deny that he was involved in drug sales and related activities, given the undisclosed police reports. Third Am. Pet. 50. (The referenced testimony occurred at a pretrial hearing in the Johnson trial; Robles was not asked at Bridges' trial whether he was involved in drug sales. See Pet. Ex. 20, Doc. No. 55-1, at 27.) By extension, in Bridges' view, the undisclosed police reports show that prosecution knowingly allowed false or misleading testimony by Robles insofar as Robles was permitted to give the impression that he was a reluctant witness with no motive to lie and no bias for the government. Third Am. Pet. 51; Pet'r Cons. Traverse 20.

Arguably, the undisclosed police reports were never exhausted as the factual basis for a Napue claim; the reports were submitted in state-court proceedings only as to Bridges' Brady

---

[15] Johnson told the police that Bridges was "the trigger man" for the shooting and further that Bridges had shot him (Johnson) and left him to die because Bridges believed that Johnson orchestrated the robbery that precipitated the Banks murders. Commonwealth v. Johnson, 727 A.2d 1089, 1100 (Pa. 1999). Robles testified at Johnson's trial that Johnson told him the same story shortly after the murders. Pet. Ex. 39, Doc. No. 55-6, at 40 (Robles' testimony); see also Pet. Ex. 29, Doc. No. 55-3, at 50-51 (Robles' pre-trial statement to police).

claim. Second PCRA Pet. 14-15 & n.4. But this possible procedural default may be overlooked given the somewhat ambiguous border between the two types of claims. See Banks, 540 U.S. at 690 n.11 (treating as an open question whether Brady and Napue claims must be separately pleaded and exhausted for habeas purposes); cf. 28 U.S.C. § 2254(b)(2) (habeas court may deny relief on the merits even absent exhaustion).

On the merits, it is undoubtedly true that Napue extends to false testimony that goes only to the witness's credibility, like false denials of bias. Napue itself involved such false testimony. See 360 U.S. 269-70. But the undisclosed police reports do not show that George Robles testified falsely on matters of credibility. Robles was never asked directly, during the guilt phase of the trial, whether he was involved in drug dealing or other criminal activity. While the police reports were material for purposes of Brady, they do not reveal that Robles affirmatively lied on the stand.

Bridges has not shown that any portion of Robles' trial testimony was false or that the prosecution knew that testimony to be false. Bridges is not entitled to habeas relief on Claim I.B.2.

## 2. Claim I.B.3: Ineffective Assistance for Failure to Uncover Withheld Evidence

*Exhaustion*

In case I rejected his Brady claim, Bridges includes an alternative claim that his trial counsel was ineffective to the extent that counsel could have, but did not, uncover the police reports that form the basis for the Brady claim. Third Am. Pet. 56. Counsel's ineffective performance may be good cause to forgive a petitioner's failure to develop the basis of a constitutional claim, but ineffective assistance is itself a substantive Sixth Amendment claim that should be separately presented to the state courts. Murray v. Carrier, 477 U.S. 478, 488-89

(1986). Bridges nowhere suggested to the state courts that his prior counsel was ineffective for failing to uncover the police reports at issue in his <u>Brady</u> claim, though he presented several other such ineffective-assistance claims. <u>See, e.g.</u>, First PCRA Br. 23-24 (trial counsel ineffective for failure to object to Robles' trial testimony); Second PCRA Pet. 28-32 (prior counsel ineffective for failure to discover alleged bad faith destruction of evidence). Therefore, Claim I.B.3 was not fairly presented to the state courts, and thus I will not address the merits.

3.   **Claim I.C.: Denial of Funding to Investigate <u>Brady</u> Claim during PCRA Proceedings**

***Exhaustion***

In Claim I.C, Bridges argues that the state courts' denial of resources for him to investigate his <u>Brady</u> claim in post-conviction proceedings was a violation of due process and equal protection. Third Am. Pet. 57-59.

The legal basis for this claim is complicated. Bridges asserts (i) that he has a state-created liberty interest in post-conviction review procedures available under Pennsylvania law, and (ii) that this liberty interest is shielded by the due-process clause of the Fourteenth Amendment of the federal Constitution. Third Am. Pet. 57-58. In his view, once the protections of the Fourteenth Amendment attach to this liberty interest, the state is obligated to provide him with certain "basic tools" necessary to vindicate the post-conviction review process—including, here, funds for an investigator. <u>Id.</u> at 58-59.

Whatever the merit of this constitutional argument, it appears nowhere in Bridges' submissions to the state courts. Although he sought funding for a private investigator in his first PCRA proceeding, <u>see</u> First PCRA Pet. 13-17, Bridges never argued that denial of such funding would violate any federal due process right that he might have to effective or reliable post-

58

conviction relief. The only constitutional argument attached to his request for an investigator was the claim that an investigator was necessary to confirm the existence of the <u>Brady</u> claim. First PCRA Br. 19-22. These are not substantially equivalent claims. The asserted constitutional right in Claim I.C was not fairly presented to the state courts during PCRA proceedings, and thus I cannot address the claim on the merits.

### 4.  Claim I.D: The Ballistics Expert

***Exhaustion***

In Claim I.D of his Third Amended Petition, Bridges argues that his right to due process was violated when the state courts refused to authorize funds to pay for a ballistics expert witness for the defense. Third Am. Pet. 59-63. Prior to trial, Bridges requested funds to hire such an expert. <u>Bridges I</u>, 757 A.2d at 867; <u>see also</u> N.T. Omnibus Pretrial Hearing 22 (oral request for funds for ballistics expert). The request was denied, and Bridges challenged the denial during his direct appeal. <u>Bridges I</u>, 757 A.2d at 868. Thus, there is no question that the <u>factual</u> basis for this claim was before the state courts.

However, Bridges' direct appeal did not present the <u>legal</u> basis of his current claim: His brief did not argue that the denial of funding was an error of constitutional magnitude. Direct Appeal Br. 4. He did not say, as he does now, that without such funds he could not fairly defend himself or could not receive effective legal assistance. Third Am. Pet. 59-60. Because Bridges failed to give the state courts an opportunity to consider the legal basis for his current ballistics-expert claim, he did not satisfy the exhaustion requirement for this claim.

To avoid this conclusion, Bridges argues that he fairly presented the legal basis for his claim on direct appeal because the Pennsylvania Supreme Court's opinion indicates that the court was led to a "method of legal analysis" consistent with the correct federal legal standard.

Pet'r Second Reply 12 (quoting <u>Evans</u>, 959 F.2d at 1231). In <u>Bridges I</u>, Bridges' direct appeal,

the Pennsylvania Supreme Court stated that "an accused in a capital case is entitled to the

assistance of experts necessary to prepare his defense." 757 A.2d at 867. The court relied, for this

principle, on <u>Commonwealth v. Carter</u>, 643 A.2d 61, 72-73 (Pa. 1994), which in turn relied on a

federal case from this court, <u>United States ex. rel. Dressus v. Pennsylvania</u>, 316 F. Supp. 2d 411,

418 (E.D. Pa. 1970).

     This does not suffice for exhaustion. Although a petitioner may fairly present a federal

claim to the state courts by citing state-court precedents employing a substantially equivalent

"method of legal analysis," <u>Evans</u>, 959 F.2d at 1231, that principle is of no help to Bridges. The

discussion of the ballistics expert in his direct appeal brief—only three paragraphs long—does

not cite <u>any</u> cases, let alone state-court cases that might lead the state court to apply a standard

consistent with federal law. And the Pennsylvania Supreme Court's quotation from

<u>Commonwealth v. Carter</u> does not suggest that Bridges' terse briefing alerted the state court to

the difficult constitutional question he now presses.[16] If the Constitution requires the state to pay

---

[16] Assuming for the sake of argument that Bridges is correct—<u>i.e.</u>, that he fairly presented the
legal basis for this claim because the state court was led to consider it under standards consistent
with federal law—the state court's resolution of the claim would be entitled to deference. 28
U.S.C. § 2254(d)(1). That deference would be difficult to overcome because there is little clearly
established federal law in this area. In <u>Ake v. Oklahoma</u>, 470 U.S. 68 (1985), the Supreme Court
held that due process requires a state to provide the defendant with access to a competent
psychiatric evaluation when the defendant's sanity is in issue. The Court described this right as
part of a broader due process obligation to equip the defendant with the "basic tools of an
adequate defense." <u>Id.</u> at 77 (quoting <u>Britt v. North Carolina</u>, 404 U.S. 226, 227 (1971)). But
later in the same term, the Court declined to decide whether and when due process might entitle a
defendant to the appointment of other experts, including a ballistics expert. <u>Caldwell v.
Mississippi</u>, 472 U.S. 320, 323 n.1 (1985). In the wake of this pair of cases, several federal courts
have held that due process sometimes requires the appointment of non-psychiatric experts if
denial of such assistance would result in an unfair trial, <u>see, e.g.</u>, <u>Yohey v. Collins</u>, 985 F.2d 222,
227 (5th Cir. 1993); <u>Kordenbrock v. Scroggy</u>, 919 F.2d 1091, 1105 (6th Cir. 1990) (en banc);
<u>Little v. Armontrout</u>, 835 F.2d 1240, 1244 (8th Cir. 1987), but the Supreme Court has not

for a ballistics expert for the defense in some cases, this federal right is not so commonplace that Bridges could assert it merely by arguing that the trial court erred in denying his request for an expert. Bridges did not fairly present Claim I.D on direct appeal, and thus I will not proceed to the merits.

**5. Claim I.E: Denial of Right to Put on a Defense**

*Exhaustion*

In Claim I.E of his Third Amended Petition, Bridges argues that his right to present witnesses in his defense was violated when the trial court refused to permit him to call as trial witnesses a police officer and the prosecuting district attorney. Third Am. Pet. 64-65. According to Bridges' offer of proof to the trial court, each witness would have testified that, prior to the trial, George Robles had never stated that he had seen Bridges with a Glock prior to the murders or had heard Bridges say that he was going to "kill" the Banks cousins. N.T. Vol. VI 1309, 1317-19. The proffered testimony of both witnesses was excluded as cumulative by the trial judge. Id. at 1309-10, 1319.

This claim was fairly presented to the Pennsylvania Supreme Court in Bridges' direct appeal. See Bridges I, 757 A.2d at 875-76 (finding no abuse of discretion in excluding proposed testimony as cumulative). As with Claim I.B.2, supra, the reliance on false testimony claim, the Pennsylvania Supreme Court's discussion of this claim does not expressly refer to the constitutional issues raised in Bridges' habeas petition, but the federal basis for the claim is

revisited the issue. Under § 2254(d)(1), habeas relief is difficult to grant if the Supreme Court has not spoken clearly to the issue. See, e.g., Bowling v. Parker, Civ. No. 03-28, 2012 WL 2415167, at *13 (E.D. Ky. June 26, 2012) (no clearly established federal right to ballistics expert); Sanchez v. Hedgpeth, 706 F. Supp. 2d 963, 988-89 (C.D. Cal. 2010) (same, for ballistics and/or fingerprint expert). The question is only academic here because Bridges did not present the federal legal basis for his denial-of-funding claim to the state courts.

discernible in Bridges' appellate briefing. See Direct Appeal Br. 32 ("fundamental right to present evidence"); id. at 35 (exclusion of witnesses "constitutes a violation of the appellant's right to due process"). Therefore, I may proceed to the merits.

***Merits Discussion***

This claim was decided on the merits by the Pennsylvania Supreme Court during Bridges' direct appeal. Bridges I, 757 A.2d at 875-76. The state court determined that exclusion of the two witnesses was proper because their testimony would have been cumulative as a matter of state evidence law, given that Bridges had been allowed to call Criminal Investigator Cabrera to testify to the same thing. Id. Because the state court decided on the merits that there was no error in excluding these two witnesses, the deferential standards of review of 28 U.S.C. § 2254(d) apply, even though the state court did not expressly apply federal constitutional standards. Thomas, 570 F.3d at 115. Bridges argues that the state-court decision is objectively unreasonable under the second clause of § 2254(d)(1). Pet'r Mem. in Support of Pet. 23-24.

The state-court decision was not an unreasonable application of clearly established federal law within the meaning of § 2254(d)(1). Although a criminal defendant has a federal constitutional right to call witnesses and present a defense, that right is subject to reasonable restrictions imposed by the law of evidence. See Chambers v. Mississippi, 410 U.S. 284, 302 (1973) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense. In the exercise of this right, the accused . . . must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence."). Exclusion of evidence as cumulative is one of those reasonable restrictions. See, e.g., United States v. Holmes, 44 F.3d 1150, 1157 (2d Cir. 1995); Roussell v. Jeane, 842 F.2d 1512, 1516 (5th Cir. 1988); Watkins v. Callahan, 724 F.2d 1038, 1044 (1st Cir.

1984). The state-court decision was a reasonable application of this restriction: The two proffered witnesses would have said what Criminal Investigator Cabrera had already said. Because the state-court decision was not an unreasonable application of clearly established federal law, Bridges is not entitled to habeas relief on Claim I.E.

## C.      Claim II: Notice and Opportunity to Defend

*Exhaustion*

In Claim II, Bridges argues that the prosecution "sandbagged" him at trial by presenting evidence and argument that he was a principal rather than merely an accomplice in the shootings. Third Am. Pet. 68. This unfair surprise allegedly violated Bridges' federal due process right to notice of the charges against him and an opportunity to defend against those charges. Id. at 69-70. This claim was not presented in federal constitutional terms on direct appeal, although it was fairly presented as the basis for an ineffective-assistance claim in PCRA proceedings.

By way of background, Bridges was charged with being an accomplice to the shooting of the Banks cousins. He was not alleged to have actually done the shooting himself. Bridges I, 757 A.2d at 876. However, as described above, the prosecution elicited testimony at trial from George Robles to the effect that Robles had observed Bridges in possession of a 9 millimeter Glock handgun hours before the shooting and that Robles had heard Bridges say that he (Bridges) was going to kill the Banks cousins. Id. at 865, 874-75.[17] The evidence also suggested

---

[17] Bridges has consistently maintained that he did not learn of these two details until the prosecution made an offer of proof the day before Robles testified at trial. Bridges I, 757 A.2d at 874. By the time of Bridges' trial, Robles had already testified at the trial of Bridges' co-conspirator Roderick Johnson. In his prior testimony at the Johnson trial, Robles said that he heard Bridges, Johnson, and Richard Morales say that they were going to "take care of their business" and "do what they had to do" to the Banks cousins. See Commonwealth v. Johnson, Crim. No. 118/97, Tr. Vol II, at 508-10 (Doc. No. 55, Ex. 39). Robles' prior trial testimony did not mention seeing Bridges with the Glock prior to the murder, though he was not specifically

that a 9 millimeter Glock was fired at the victims through the front passenger seat of the van,

where Bridges himself claimed to have been when the shooting began. N.T. Vol. IV 942, 1032-

33; N.T. Vol. V 1113.

The implication—that Bridges fired the Glock at the victims from the front passenger

seat—was made explicit for the jury during closing argument. The prosecutor asked, in apparent

reference to Bridges, "Who had the 9 mm? Who executed this man from the back of the head?"

N.T. Vol. VI 1390; see also id. at 1388-89 (arguing that co-conspirator Roderick Johnson had the

.38 caliber gun and, by implication, that Bridges had the 9 millimeter gun). Bridges' trial counsel

objected to this argument as improper given the prosecution's own theory that Bridges was an

accomplice, not a principal, and the trial court instructed the jury to disregard it. Id. at 1390-

1391.

The Pennsylvania Supreme Court's opinion in Bridges' direct appeal contains no

reference to any due process claim arising from these events at trial. Nevertheless, Bridges

argues that the claim was fairly presented in three sections of his brief on direct appeal. Pet'r

Second Reply 25-26. One section of the brief refers to a "violation of his . . . due process rights."

Direct Appeal Br. 8-9. But this "due process" language appears in the midst of an argument that

the trial court should have granted a pretrial motion to dismiss some of the charges because of

errors in the charging documents; no due-process argument was directed at what actually

occurred at trial. The other two portions of his direct appeal brief that Bridges relies on for

exhaustion do address events at trial, but neither section sounds in a federal due process right to

notice and opportunity to defend. See Direct Appeal Br. 28-29 (argument that Robles committed

asked. Id. at 513.

perjury); id. at 36-39 (argument that prosecutor committed misconduct at closing). Claim II was not exhausted as a due process claim on direct appeal.

However, under the heading of Claim II, Bridges also argues that his trial counsel provided ineffective assistance by failing to object to the admission Robles' testimony and/or by failing to request a continuance or a mistrial based on it. Third Am. Pet. 74. Bridges relies on his PCRA submissions for exhaustion of this aspect of Claim II. Pet'r Second Reply 26; Pet'r Mem. in Support of Pet. 42-45. Bridges did indeed claim in PCRA proceedings that his trial counsel was ineffective for failing to object to Robles' testimony. See Bridges II, 886 A.2d at 1131-32 (discussing ineffective-assistance claim). Thus, this aspect of Claim II was fairly presented to the state court as an ineffective-assistance claim.

The scope this claim, as exhausted, is limited. In PCRA proceedings, Bridges argued only that his trial counsel was ineffective for failing to object to the admission of Robles' testimony. First PCRA Br. 23. He did not suggest that his trial counsel was ineffective more broadly for failing to raise a due process challenge to the prosecution's alleged switch from a theory of accomplice liability to principal liability. The distinction is not academic. If Bridges fairly presented a claim that his trial counsel was ineffective for failing to make a due process challenge to the prosecution's "sandbagging," then counsel's ineffectiveness might be a reason to forgive Bridges' failure to raise and exhaust the due process claim itself. Murray, 477 U.S. at 488-489; Werts v. Vaughn, 228 F.3d 178, 193 (3d Cir. 2000). That is not the situation here.

The only claim fairly presented to the state court in PCRA proceedings was that Bridges' trial counsel should have objected to the admission of Robles' trial testimony.[18] That portion of

---

[18] Bridges argued in state court that his counsel should have objected to Robles' testimony as beyond the scope of pretrial discovery provided by the Commonwealth. First PCRA Br. 23. In

Claim II was exhausted, and may be considered on the merits.

***Merits Discussion***

The Pennsylvania Supreme Court adjudicated this ineffective assistance claim on the merits during Bridges' first PCRA proceedings. Bridges II, 856 A.2d at 1131-32. The state court held that Bridges could not demonstrate that his counsel was ineffective for failing to object to this testimony because the testimony had already been found to be admissible in Bridges I. See Bridges II, 856 A.2d at 1133 (citing Bridges I, 757 A.2d at 874)). The state court went on to hold that Bridges could not re-litigate the admissibility of the evidence under the guise of an ineffective assistance claim. Id.

Bridges construes this discussion in Bridges II as a refusal to adjudicate his ineffective assistance claim on the erroneous ground that it was previously litigated, and he discusses at some length whether this "previously litigated" holding might be a procedural barrier to federal relief. Pet'r Mem. in Support of Pet. 44-46. But this is a misreading of the Pennsylvania Supreme Court's opinion, which held simply that Bridges could not succeed on an ineffective assistance claim for failure to object to inadmissible evidence if he had already litigated and lost the question of admissibility.

The state court decision is not contrary to or an unreasonable application of clearly established federal standards for ineffective assistance of counsel. Under the Sixth and

his federal petition, Bridges now argues that Robles' testimony was objectionable for additional reasons. These are obviously not identical arguments, but they are fairly read as mere refinements to the same claim. Cf. Landano v. Rafferty, 897 F.2d 661, 671 n.13 (3d Cir. 1990) (discussing application of exhaustion doctrine to ineffective assistance of counsel claims, which "encompass an almost limitless range of possible errors" (quoting Lanigan v. Maloney, 853 F.2d 40, 45 (1st Cir. 1988))). The substance of Bridges' claim—in both state and federal court—is that Robles' testimony was an unfair surprise at trial and that the testimony would not have been admitted if his trial counsel had performed effectively.

Fourteenth Amendments, a criminal defendant has the right to effective assistance of counsel, which is violated if the attorney's performance falls "below an objective standard of reasonableness" and "the petitioner suffer[s] prejudice as a result of the deficiency." Blystone, 664 F.3d at 418 (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). Once a Strickland claim has already been adjudicated on the merits by the state court, a habeas petitioner has the additional burden of showing that the state court's decision about the reasonableness of counsel's performance was itself unreasonable. Id. "The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." Harrington, 131 S. Ct. at 788. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690.

 Here, there is at least a reasonable argument that counsel's decision not to object to Robles' testimony comported with objective standards of competent performance. After the Commonwealth's proffer as to Robles' testimony, trial counsel told the trial court the following: "I have an objection but I think it will go to cross-examination as opposed to objections of the admissibility of evidence." N.T. Vol. V 1052. In context, it appears that Bridges' trial counsel made a reasonable strategic decision to cross-examine Robles on the question of recent fabrication rather than object to his testimony as inadmissible (an objection that Bridges I held would have failed).

Bridges now asserts that Robles' testimony was objectionable on due process grounds— not simply admissibility grounds—because it was part of a broader and unfair shift in the prosecution's case from a theory of accomplice liability to a theory of principal liability. Third Am. Pet. 68-72. But nothing in Robles' testimony itself was inconsistent with the Commonwealth's accomplice theory. Robles testified that he saw Bridges with a 9 millimeter

67

gun prior to the murders, not that he witnessed Bridges firing the gun. Any due process objection

made at trial would likely have failed. After all, Bridges' trial counsel had actual knowledge that

the prosecution believed Bridges possessed the 9 millimeter gun prior to the murders: They had

heard the prosecution assert this during Roderick Johnson's trial. See N.T. Vol. IV 730. I cannot

say that the state court unreasonably applied federal law when it rejected Bridges'

ineffectiveness claim. Therefore, Bridges is not entitled to relief on Claim II.

**D.      Claim III: Jury Instructions on Accomplice and Conspiracy Liability**

*Exhaustion*

        In Claim III, Bridges argues that the trial court's instructions to the jury about accomplice

and conspiracy liability permitted the jury to find him guilty without proof beyond a reasonable

doubt of all the elements of first-degree murder required under Pennsylvania law. Third Am. Pet.

76-77. Federal due process requires such proof. In re Winship, 397 U.S. 358 (1970).

        Bridges challenged these instructions on direct appeal. Bridges I, 757 A.2d at 876-77. In

presenting his jury-instruction challenge to the Pennsylvania Supreme Court, he relied on state

cases that apply the relevant federal standard. See Direct Appeal Br. 54 (citing Commonwealth

v. Huffman, 638 A.2d 961 (Pa. 1994) (citing In re Winship, 397 U.S. 358)); id. at 57 (citing

Commonwealth v. Thompson, 674 A.2d 217 (Pa. 1996) (applying Huffman)). Thus, Bridges

exhausted his available state-court remedies for Claim III by fairly presenting the federal claim

on direct appeal. I will proceed to the merits.

*Merits Discussion*

        "[D]ue process requires that each element of the charged offense be proved beyond a

reasonable doubt." Williams v. Beard, 637 F.3d 195, 220 (3d Cir. 2011) (citing In re Winship,

397 U.S. at 364). "Intent to kill is an element of first degree murder under Pennsylvania law. 18

Pa. Cons. Stat. § 2502(a). This element must be proved whether the defendant is the principal or

merely an accomplice to the homicide." Id.

The trial judge instructed the jurors on the elements of first-degree murder as follows:

First, the Commonwealth must prove that Damon and Gregory Banks are
dead. Second, that Roderick Johnson killed them. And third, that Roderick
Johnson, an accomplice of the defendant did so with the specific intent to
kill and with malice.

I will tell you later on when I define accomplice, in order for the
defendant to be an accomplice as to first degree murder, he also—the
Commonwealth must also prove that he had a specific intent to kill, even
though Roderick Johnson was the actual slayer.

N.T. Vol. VI 1402 (emphasis added); see also id. at 1423 ("As I have told you, one of the

elements of the crime of murder of the first degree is specific intent to kill."). After the jurors

sent out a note during deliberations requesting clarification of the distinction between murder of

the first and third degrees, the court told the jury:

There are three elements to first degree murder. The Commonwealth must
prove beyond a reasonable doubt, first, that Damon and Gregory Banks
are dead. Second, that an accomplice of the defendant killed them. It's
alleged it was Roderick Johnson, and third, that Roderick Johnson did so
with the specific intent to kill.

The additional element within that requirement is that as an
accomplice the defendant also had that intent, the specific intent to kill
through Roderick Johnson. They both must have had the specific intent to
kill. A person has the specific intent to kill if he has a fully-formed intent
to kill and is conscious of his own intention.

Id. at 1472 (emphasis added).

Bridges now points to a portion of the jury charge on first degree murder in which the

court appears to conflate Johnson's intent with Bridges' intent:

When deciding whether Roderick Johnson, an accomplice, had the
specific intent to kill, you should consider all the evidence regarding his
words and conduct and the attending circumstances that may show his

69

> state of mind and in deciding whether <u>the defendant</u> had the specific intent
> to kill as an accomplice.

N.T. Vol. V 1403 (emphasis added).  The court also repeatedly referred to Johnson as an

"accomplice," though it was Bridges who was alleged to be an accomplice to acts committed by

Johnson as the principal. Pet'r Mem. in Support of Pet. 50. Bridges finds similar alleged defects

in the conspiracy charge, which referred to the shared intent required of co-conspirators without

specifically reminding jurors that the defendant could not be found guilty of first degree murder

unless he had the specific intent to kill. Finally, Bridges takes issue with the instruction given

after the jury's note on the ground that it again invited the jurors to transfer Johnson's intent to

Bridges. Third Am. Pet. 78-79; Pet'r Mem. in Support of Pet. 49-53.

 The Pennsylvania Supreme Court determined in Bridges' direct appeal that the jury

charge, read as a whole, accurately instructed the jury on accomplice and conspiracy liability:

"Given that the record reveals that the trial court fully informed the jury as to the mental state

required to find [Bridges] guilty of first-degree murder as an accomplice, no relief is due."

<u>Bridges I</u>, 757 A.2d at 876-77.

 The Pennsylvania Supreme Court's decision was neither contrary to nor an unreasonable

application of clearly established federal law under 28 U.S.C. § 2254(d)(1). As a matter of

clearly established federal law, a challenged jury instruction must be read in light of the charge

as a whole. <u>Waddington v. Sarausad</u>, 555 U.S. 179, 190-91 (2009); <u>Estelle v. McGuire</u>, 502 U.S.

62, 72 (1991); <u>Smith v. Horn</u>, 120 F.3d 400, 411 (3d Cir. 1997). The Pennsylvania Supreme

Court's adjudication of Bridges' jury-instruction challenge was a reasonable application of this

principle. The state court aptly noted that the jury was told at several junctures that Bridges could

not be found guilty of first degree murder—whether as an accomplice or co-conspirator—absent

proof beyond a reasonable doubt that Bridges himself had the specific intent to kill. In light of the instruction as a whole, there is no reasonable likelihood that the jury applied the instructions in a way that relieved the Commonwealth of proving Bridges' specific intent to kill. Cf. Waddington, 555 U.S. at 190-91. At the very least, the Pennsylvania Supreme Court's decision to this effect was not objectively unreasonable. See id. at 192-96.

**E.      Claim V: Parole Ineligibility Instruction**

***Exhaustion***

In Claim V, Bridges argues that the trial court erred in denying his request to instruct the jury during the penalty phase that a sentence of life in prison in Pennsylvania is served without possibility of parole. Third Am. Pet. 102. Such an instruction is commonly known as a "Simmons" instruction, from the seminal case of Simmons v. South Carolina, 512 U.S. 154 (1994). In Simmons, the Supreme Court held that when a defendant's future dangerousness to society is placed in issue in a capital sentencing, due process requires that the jury be informed—if true—that the alternative to a death sentence is a sentence of life in prison without parole; otherwise, the jury's sentencing determination may rest on an inaccurate assumption that anything short of a death sentence will risk future harm to society. Id. at 162-64, 168-69 (plurality opinion); id. at 178 (O'Connor, J., concurring).

There is no question that, in his direct appeal, Bridges challenged the trial court's refusal to give a Simmons instruction. See Bridges I, 757 A.2d at 881 (holding that Simmons instruction was not required because Bridges' future dangerousness was not placed at issue in sentencing). So construed, Claim V was exhausted on direct appeal.

However, Bridges' Third Amended Petition contains several variations of this claim. In addition to the pure Simmons argument, Bridges claims that: (1) the jury should have been

instructed about his ineligibility for parole because ineligibility for parole is relevant mitigating evidence, Third Am. Pet. 108-11; (2) an instruction on parole ineligibility was required by the heightened procedural standards applicable to capital sentencing, id. at 111-14; (3) the failure to instruct on parole ineligibility violated evolving standards of decency, id. at 114-17; (4) the failure to instruct on parole ineligibility deprived Bridges of due process, independent of Simmons, because the jury received inaccurate sentencing information and/or because Bridges has a liberty interest created by state law in having the jury told of his parole ineligibility, id. at 118-22; and (5) the failure to instruct on parole ineligibility resulted in a jury uncommonly willing to impose the death sentence, id. at 122-23.

The first three sub-claims all rely on the Eighth Amendment. But only one of those claims was presented to the state courts: On his direct appeal, Bridges argued that an instruction on parole ineligibility was necessary to satisfy the "need for heightened reliability" in capital sentencing mandated by the Eighth Amendment. Direct Appeal Br. 75 (quoting Simmons, 512 U.S. at 172 (Souter, J., concurring)); see also Third Am. Pet. 112 n.65 (citing Justice Souter's Simmons concurrence for the same argument). The other two claims—invoking mitigating factors and evolving standards of decency—are nowhere to be found in Bridges' direct appeal, and they are not substantially equivalent to the Eighth Amendment claim that was presented. They rely on different lines of precedential authority and different legal standards. These claims are unexhausted.

The same is true for Bridges' claims that the failure to instruct on parole ineligibility violated due process independent of Simmons or that it resulted in a jury unusually predisposed to impose a death sentence. The latter relies on a Sixth Amendment right arising in the context of jury selection. As to the former, it should go without saying that the claim that due process

requires an instruction on parole ineligibility independent of <u>Simmons</u> is not substantially equivalent to the claim that <u>Simmons</u> itself requires such an instruction.

In sum, Claim V is exhausted only to the extent that Bridges invokes a federal right to a parole ineligibility instruction under <u>Simmons</u> or, alternatively, under the Eighth Amendment's guarantee of reliable sentencing procedures. Accordingly, I will address only these aspects of the claim on the merits.

***Merits Discussion***

Bridges' claim for a <u>Simmons</u> instruction was adjudicated on the merits by the Pennsylvania Supreme Court in his direct appeal. <u>Bridges I</u>, 757 A.2d at 881. The state court determined that such an instruction was not required under the circumstances because the prosecutor did not argue that Bridges posed a future danger to society, and "[t]he law of this Commonwealth is that a <u>Simmons</u> instruction is required to be given only in those cases where the future dangerousness of the defendant is placed at issue." <u>Id.</u> The court also noted that Bridges' trial counsel told the jurors: "In Pennsylvania, just so there is no misunderstanding among any of you, there is no parole from a life sentence in Pennsylvania." <u>Id.</u> at n.21 (quoting N.T. Vol. VII 1642).

The petitioner characterizes this state-court decision as based on a state-law definition of what constitutes "future dangerousness." Pet'r Mem. in Support of Pet. 63. The state court's opinion does not lend itself to that reading. The only precedent cited by the state court, other than <u>Simmons</u>, was a prior state court decision that itself discusses <u>Simmons</u>. <u>See</u> <u>Bridges I</u>, 757 A.2d at 881 (citing <u>Commonwealth v. Chester</u>, 733 A.2d 1242, 1257 (Pa. 1999)). Because the state court properly identified and applied governing federal law, § 2254 deference applies to my consideration of Claim V.

Simmons holds that a jury must be informed that the defendant is ineligible for parole if (i) a sentence of life in prison without parole is the only alternative to a death sentence and (ii) the defendant's future dangerousness is placed in issue at sentencing. Simmons, 512 U.S. at 163-64 (plurality opinion); id. at 178 (O'Connor, J., concurring in the judgment). There is no question that the exclusive alternative sentence for Bridges was a term of life imprisonment without parole; the only issue is whether his future dangerousness was placed in issue at sentencing.

Bridges points to two bodies of evidence as putting his future dangerousness in issue: first, the prosecution elicited testimony from George Robles that Bridges was a drug dealer who killed the Banks cousins in retaliation for attempting to rob his home; second, the prosecution introduced evidence of Bridges' juvenile criminal record. Third Am. Pet. 103-04. In both cases, according to Bridges, the inference of future dangerousness was exacerbated by the prosecution's argument. Id. He relies especially on Kelly v. South Carolina, 534 U.S. 246, 253-55 (2002), which made clear that any evidence tending to prove future dangerousness could trigger a Simmons instruction regardless of whether the evidence was also subject to other inferences or introduced for other purposes.[19] The pertinent inquiry is simply whether there is evidence in the sentencing record "with a tendency to prove dangerousness in the future." Id. at 254.

The state court's decision is not contrary to or an unreasonable application of Simmons,

---

[19] The Third Circuit has twice suggested that "the holding in Simmons was arguably broadened in Kelly" without definitively resolving the question. See Bronshtein v. Horn, 404 F.3d 700, 716 (3d Cir. 2005); Rompilla v. Horn, 355 F.3d 233, 266 (3d Cir. 2004), rev'd on other grounds sub nom. Rompilla v. Beard, 545 U.S. 374 (2005). One open question is whether a Simmons instruction can be required where the evidence at sentencing suggests that the defendant poses a future danger to society but the prosecutor does not argue future dangerousness. See Kelly, 534 U.S. at 254 n.4.

Kelly, or any other Supreme Court decision. It was not objectively unreasonable for the state court to conclude that Bridges' future dangerousness was not placed in issue at sentencing. The prosecution did not expressly argue that Bridges posed a future danger to society, and reasonable jurists could disagree about whether the evidence and argument cited by Bridges gave rise to an implicit inference of future dangerousness. By way of comparison, the prosecutor in Simmons introduced evidence that the defendant posed a continuing danger to elderly women and told the jurors that a death sentence would "be an act of self-defense." 512 U.S. at 157; cf. Kelly, 534 U.S. at 248-49 (evidence and argument that defendant attempted a violent escape while awaiting trial and harbored "an inclination to kill anyone who rubbed him the wrong way"); Bronshtein, 404 F.3d at 716-17 (medical evidence and argument that defendant was "prone to living a life of crime" and "can't conform to the needs of society" (emphasis omitted)). The state court was entitled to conclude that the evidence and argument at Bridges' sentencing did not approach these clear messages of "a threat of future lawlessness." Id. at 717.

Even if Bridges' future dangerousness had been placed in issue at sentencing, a jury instruction on parole eligibility would not have been required by clearly established federal law. Under Simmons, due process mandates that the jury be accurately informed that the defendant is ineligible for parole, but this information may be provided to the jury either by the court or by counsel. Simmons, 512 U.S. at 178 (O'Connor, J., concurring in the judgment); see id. at 174 (Ginsburg, J., concurring) ("Justice O'Connor's opinion clarifies that the due process requirement is met if the relevant information is intelligently conveyed to the jury; due process does not dictate that the judge herself, rather than defense counsel, provide the instruction."); see also Shafer v. South Carolina, 532 U.S. 36, 39 (2001) (summarizing the holding of Simmons). Here, as the Pennsylvania Supreme Court noted, the jury was accurately informed by defense

75

counsel that a sentence of life imprisonment meant "without parole" under Pennsylvania law. <u>Bridges I</u>, 757 A.2d at 881 n.1 (quoting N.T. Vol. VII 1642). The Pennsylvania Supreme Court could reasonably conclude that Bridges was not deprived of due process under the circumstances.

A final word must be said about the alternative argument exhausted by Bridges in this context—namely, that an instruction on parole ineligibility was required by the Eighth Amendment's guarantee of reliable sentencing procedures, independent of due process and regardless of whether future dangerousness is in issue. Third Am. Pet. 111-14. The same argument was made by Justice Souter in his concurring opinion in <u>Simmons</u>, which was joined only by Justice Stevens; the plurality opinion by Justice Blackmun did not rest on Eighth Amendment grounds. <u>See</u> 512 U.S. at 162 n.4 (plurality opinion); <u>id.</u> at 172-74 (Souter, J., concurring). In affirming Bridges' conviction and sentence, the Pennsylvania Supreme Court did not discuss this alternative legal basis for a parole ineligibility discussion. It is hard to find fault with that decision under § 2254(d): There is no clearly established Eighth Amendment right to a jury instruction on parole ineligibility, and recognizing an Eighth Amendment right to a jury instruction on parole ineligibility—regardless of future dangerousness—would circumvent and undermine <u>Simmons</u> itself. Bridges is not entitled to habeas relief on Claim V.

**F.    Claim VI: Coercion of Jury in Penalty Phase**

***Exhaustion***

In his sixth claim for relief, Bridges argues that the trial court's instructions to the jury after it reported a deadlock during penalty deliberations caused the jurors to disregard or fail to give full effect to mitigating evidence. Third Am. Pet. 124-25. This claim was not fairly presented on direct appeal. Although Bridges has challenged the decision to order the jury to

76

continue to deliberate after it reported a deadlock, he never before claimed that the jury

instructions themselves were problematic.

      The Pennsylvania Supreme Court summarized the jury's deadlock as follows:

> The jury retired to deliberate Appellant's sentence at 4:20 p.m. on February 4, 1998. At approximately 8:15 that same evening, the jury foreman informed the court that the jury could not reach a verdict, that it was "split", and that he did not feel that further instructions would assist the jury in reaching a verdict. Defense counsel at that point requested that the court declare a hung jury. Instead, the trial court ended the deliberations for the day and instructed the jury to return in the morning to continued deliberations.

Bridges I, 757 A.2d at 881 (internal record citation omitted). When the jurors returned the next

morning, the trial court instructed them to resume deliberations:

> Good morning, ladies and gentlemen. I know you indicated yesterday that after deliberations for approximately four hours that you were unable to reach unanimous verdicts on the penalties for the two murder convictions. I would like you to again begin talking about this matter.
>
> I would like to ask you to maybe start again freshly. See if you can arrive at unanimous verdicts on the penalties. Unanimous verdicts as to the death penalty or as to life imprisonment. I am going to ask you to listen to each other. Sometimes [the] minority is able to convince the majority or the majority is able to convince the minority. It can go either way.
>
> Of course, the minority should not go along with the majority unless they are convinced that it is the only proper course. Carefully review the instructions I have given you and the verdict slips and the written instructions. Review the law and review the facts from the trial itself, from the penalty hearing, the arguments of counsel and see if you cannot, upon further deliberations, after having a good night's sleep[,] arrive at unanimous verdicts.

N.T. Vol. VII 1671-72.

      On direct appeal, Bridges argued that the jurors should not have been sent home on the

evening of February 4, 1998, and that the trial court should instead have declared a hung jury and

imposed a sentence of life in prison. Direct Appeal Br. 78-79; <u>see also</u> 42 Pa. Cons. Stat. Ann. §

9711(c)(v) (if jury cannot return a unanimous verdict, "the court shall sentence the defendant to

life imprisonment"). The Pennsylvania Supreme Court rejected that argument on the ground that

the decision to send the jurors home—despite an apparent deadlock—and to ask them to

continue deliberating the next morning was within the trial court's discretion. <u>Bridges I</u>, 757

A.2d at 881-82.

      Bridges' federal habeas claim does <u>not</u> allege that the decision to send the jurors home on

February 4 was erroneous. Instead, Claim VI targets the instructions, quoted above, that the trial

court gave when the jury resumed deliberations on February 5. <u>See, e.g.</u>, Third Am. Pet. 125 ¶

215 ("trial court's instructions . . . violated Petitioner's Sixth, Eighth, and Fourteenth

Amendment rights"); <u>id.</u> 125 ¶ 216 ("the court's instructions prevented jurors . . . from

considering and giving full effect to . . . mitigating evidence"); <u>id.</u> 126 ¶ 217 ("prejudice arising

out of the instructions is clear"). Bridges claims that the instructions given on February 5 were

coercive because they effectively required the jury to reach a unanimous verdict.

      This attack on the jury instructions is not substantially equivalent to the claim made in

Bridges' direct appeal. The claims are not even internally consistent. If Bridges had been correct,

in his direct appeal, that the trial court should have declared a hung jury after the jury's reported

deadlock on February 4, then no instruction to resume deliberations on February 5 would have

been proper. Bridges' current federal claim implicitly concedes that the jury could have been

asked to deliberate despite its apparent deadlock; he now takes issue only with the instructions

given to do so.

      As a fallback position, Bridges also points to PCRA submissions for exhaustion of Claim

VI. Third Am. Pet. 124 n.75; Pet'r Second Reply 16 & n.6. But Bridges' PCRA brief merely

restated his claim from direct appeal with some additional allusions to the U.S. Constitution. See

First PCRA Br. 31 ("Appellant's constitutional rights . . . were violated when the trial court

instructed the jury to deliberate further after the jury informed the trial court after approximately

four hours of deliberation that it could not come to an agreement on the penalty . . . ."); see also

Bridges II, 886 A.2d at 1133 (noting that same claim was previously litigated on direct appeal).

Thus, the only claim presented to the Pennsylvania Supreme Court either on direct appeal or in

PCRA proceedings was that the jury should not have been ordered to continue to deliberate after

it reported a deadlock.

      The purpose of exhaustion doctrine is to give the state courts "the first opportunity to

hear the claim sought to be vindicated in a federal habeas proceeding." Picard, 404 U.S. at 276.

Bridges' direct appeal did not provide the Pennsylvania Supreme Court with such an opportunity

as to Claim VI. Accordingly, I may not address the merits of the claim.

## G.    Claim VII: Irrelevant Evidence at Sentencing

### *Exhaustion*

      In Claim VII, Bridges argues that the jury was exposed to inadmissible aggravating

evidence in the penalty phase during the testimony of George Robles, in violation of Bridges'

Eighth and Fourteenth Amendment rights. Third Am. Pet. 130. A limited form of this claim was

fairly presented to the Pennsylvania Supreme Court on direct appeal.

      Some context is necessary to understand the claim. As explained above, under

Pennsylvania's death penalty scheme, the jury must determine whether any aggravating

circumstances are present and, if so, whether the aggravating circumstance or circumstances are

outweighed by any mitigating circumstances. 42 Pa. Cons. Stat. Ann. § 9711(c)(iv). The

evidence presented in the penalty phase must be relevant to one of the specifically enumerated

aggravating circumstances, to any mitigating circumstances, or to the impact of the death of the victim or the victim's family. Id. § 9711(a)(2).

The prosecution attempted to prove that two aggravating circumstances were present in the Banks murders. Bridges I, 757 A.2d at 878. The first aggravating circumstance applies when "[t]he defendant has been convicted of another murder committed in any jurisdiction and committed either before or at the same time of the offense at issue." 42 Pa. Cons. Stat. Ann. § 9711(d)(11). The prosecution's theory for § 9711(d)(11) was that Bridges had been convicted of the simultaneous murder of both Gregory and Damon Banks. The second aggravating circumstance that the prosecution sought to prove applies to certain killings committed by drug dealers against their rivals or associates:

> At the time of the killing, the victim was or had been involved, associated or in competition with the defendant in the sale, manufacture, distribution or delivery of any controlled substance or counterfeit controlled substance . . . , and the defendant committed the killing or was an accomplice to the killing . . . , and the killing resulted from or was related to that association, involvement or competition to promote the defendant's activities in selling, manufacturing, distributing or delivering controlled substances or counterfeit controlled substances.

Id. § 9711(d)(14). The prosecution's theory for § 9711(d)(14) was that Bridges was a crack cocaine dealer and that he killed the Banks cousins to retaliate for the cousins' attempt to steal drugs from his home. N.T. Vol. VI 1440-41. The jury found only the first aggravating circumstance, related to the simultaneous murder of the Banks cousins. Thus, the jury implicitly determined that the prosecution had failed to prove the second aggravating circumstance, related to rival drug killings. The jury found no mitigating circumstances.

In seeking to prove the second aggravating factor, the prosecutor asked several questions of George Robles at sentencing in an apparent effort to demonstrate that Bridges killed the Banks

cousins to safeguard his "reputation on the streets" and thus to promote his drug-dealing business within the meaning of § 9711(d)(14):

> Q.   Based on your knowledge, personal knowledge, and based on your experience in seeing the three on the street corner, Richard Morales, Roderick Johnson, and Shawn Bridges, if someone tries to take their—tries to take their material—
> . . .
> Q.   With respect to Shawn Bridges and his business, did he say why the two Banks' cousins had to die?
> . . .
> Q.   Does respect on the street have any significance based on your personal knowledge?
> . . .
> Q.   What, if any[,] role does the lack of retaliation play in one's drug business, if you know, sir?

N.T. Vol. VII 1508-09; see also id. at 1534 (similar question during re-direct examination of Robles). The inappropriate questioning continued during the prosecution's re-direct examination of Robles: "If someone ripped off [the defendant's] drugs and money, how would that affect his reputation in the neighborhood?" Id. at 1534. The trial court sustained an objection to each of these five questions but refused to declare a mistrial. Id. at 1510-11. Bridges' counsel successfully objected to each of these questions, but the trial court refused to grant a mistrial based on them. Id. at 1509-11, 1534. On his direct appeal, Bridges pursued a claim of prosecutorial misconduct based on this line of questioning, but the court rejected it because Bridges' contemporaneous objections to the questions were sustained. Bridges I, 757 A.2d at 879.

In Claim VII of his habeas petition, Bridges continues to argue that the prosecution committed misconduct by posing these questions to Robles. Third Am. Pet. 130-31. Because the prosecutorial misconduct claim was fairly presented on direct appeal—and was supported with citation to federal law, Direct Appeal Br. 45-47, 49—Bridges has satisfied the exhaustion

requirement.

However, Bridges also alludes to a second, distinct argument under the heading of Claim VII: a challenge to the admissibility of the testimony that Robles gave, as opposed to the questions put to him. Third Am. Pet. 131 ¶ 231. His argument appears to be that Robles' testimony was inadmissible because it was not even relevant to proving § 9711(d)(14), in that the testimony failed to establish that the Banks cousins themselves were involved in the sale or manufacture of drugs. Id. (Bridges does not specifically identify which portion of Robles' testimony was inadmissible. The only material quoted in this portion of the habeas petition came from the mouth of the prosecutor, not Robles.)

Setting aside the merits of this alternative argument, it was not fairly presented to the state court. Bridges did argue in his direct appeal that the jury was exposed to inadmissible evidence during Robles' testimony at sentencing. Direct Appeal Br. 60-73. But his claim at the time was that § 9711(d)(14) should not have been submitted to the jury at all, not that Robles' testimony was irrelevant to proving § 9711(d)(14).[20] These two arguments—that Robles' testimony was inadmissible because it was not relevant to § 9711(d)(14) and that § 9711(d)(14) should not have been submitted to the jury—are not substantially equivalent. One concerns the

---

[20] Section 9711(d)(14) applies only when the defendant's victim was "involved, associated or in competition with the defendant in the sale, manufacture, distribution or delivery of any controlled substance." In his direct appeal, Bridges argued that the prosecution's theory for § 9711(d)(14) would have shown, at most, that the Banks cousins attempted to steal drugs from Bridges' home, not sell drugs. See Direct Appeal Br. 64 ("[A]ttempted robbery of drugs is not 'the sale, manufacture, distribution or delivery' of drugs."). Bridges further argued that the trial court's error in permitting the prosecution to attempt to prove § 9711(d)(14) based on the robbery was not rendered harmless by the jury's rejection of that factor because the jury was exposed to evidence about Bridges' drug dealing that was otherwise inadmissible and that may have prejudiced the jury's weighing of the other aggravating and mitigating circumstances. Id. at 65-72. The Pennsylvania Supreme Court held both that the submission of § 9711(d)(14) to the jury was proper and that any possible error was harmless. Bridges I, 757 A.2d at 879.

relevance of evidence to a given aggravating circumstance, while the other concerns the trial

court's decision to submit the aggravating circumstance to the jury in the first instance. Thus,

Claim VII was exhausted only as a prosecutorial misconduct claim, focused on the "respect on

the street" line of questioning at sentencing, and that is the only claim I may address on the

merits.

***Merits Discussion***

The Pennsylvania Supreme Court adjudicated this prosecutorial-misconduct claim on the

merits during Bridges' direct appeal. Bridges I, 757 A.2d at 879. The state court concluded that

Bridges was not entitled to relief because he could not show any prejudice. See id. ("[T]he trial

court sustained Appellant's objections to this line of questioning, and we fail to see how the

unanswered hypothetical questions prejudiced Appellant so that he would be entitled to relief.").

The state court's decision is not contrary to or an unreasonable application of clearly

established federal law under 28 U.S.C. § 2254(d)(1). In the absence of more specific

constitutional guarantees, the applicable framework for a claim of prosecutorial misconduct

comes from Donnelly v. DeChristoforo, 416 U.S. 637 (1974), which held that improper

prosecutorial argument violates due process only when the misconduct renders the entire

proceeding fundamentally unfair. See Romano v. Oklahoma, 512 U.S. 1, 12-13 (1994)

(prosecutor's improper use of evidence at capital sentencing); Darden v. Wainwright, 477 U.S.

168, 178-82 (1986) (prosecutor's improper closing argument in guilt phase of capital trial). It

was objectively reasonable for the state court to conclude that the prosecutor's questions here—

all of which were successfully objected to by Bridges' counsel—did not render the sentencing

proceeding fundamentally unfair. The questions were apparently an ill-considered attempt to

prove that Bridges was motivated to kill the Banks cousins for reasons that would trigger one of

83

the aggravating circumstances that the prosecution was attempting to prove. 42 Pa. Cons. Stat. Ann. § 9711(d)(14). They were not an open invitation to impose the death penalty for improper reasons, nor was the language of the questions particularly inflammatory.

The other federal cases cited by Bridges in this context are inapposite and speak only to his unexhausted claim that the jury was permitted to consider "inadmissible, non-statutory" aggravating evidence. Pet'r Mem. in Support of Pet. 69-70. Bridges is not entitled to habeas relief on Claim VII.

## H.    Claim VIII: Invalid Aggravating Factor

### *Exhaustion*

In Claim VIII, Bridges argues that the jury should not have been permitted to consider 42 Pa. Cons. Stat. Ann. § 9711(d)(11), the multiple murder aggravator because § 9711(d)(11) does not apply to accomplices. Third Am. Pet. 133. This claim was never presented in its current form to the state courts.

Bridges disputed the applicability of § 9711(d)(11) during his direct appeal, but his claim was solely one of statutory construction. Some of the aggravating circumstances in the Pennsylvania death penalty statute expressly refer to accomplices, but § 9711(d)(11) does not. It states simply that the defendant must have been "convicted of another murder . . . committed either before or at the same time of the offense at issue." The Pennsylvania Supreme Court construed this language to include multiple convictions as an accomplice. Bridges I, 757 A.2d at 878-79.

Claim VIII is now styled as an equal protection and due process claim. Bridges argues that the Pennsylvania Supreme Court's construction of § 9711(d)(11) violates these rights because it is inconsistent with the state court's construction of similar language elsewhere in the

84

death penalty statute. Third Am. Pet. 135, 137. He relies in particular on <u>Commonwealth v. Lassiter</u>, 722 A.2d 657, 661-62 (Pa. 1998), which held that the phrase "committed a killing" in the felony-murder aggravating circumstance, § 9711(d)(6), does not include killings committed as an accomplice. Bridges further argues, as a basis for federal relief, that the jury's consideration of this inapplicable aggravating circumstance violated the Eighth Amendment. Third Am. Pet. 137-38.

The putative federal character of Claim VIII was never presented to the state courts in Bridges' direct appeal. In his discussion of § 9711(d)(11) on direct appeal, Bridges' sole reference to federal law was a citation to <u>Tison v. Arizona</u>, 481 U.S. 137 (1995), which held that the Eighth Amendment does not forbid the death penalty for felony murder if the defendant's participation in the felony was major and exhibited at least reckless indifference to human life. Direct Appeal Br. 52. The <u>Tison</u> citation was inadequate to provide fair notice of any equal protection or due process claim that Bridges may have. Claim VIII was not fairly presented to the state courts in its current federal clothing. Therefore, I may not address the merits of the claim.

I.      **Claim IX: Prosecutorial Misconduct at Sentencing**

*Exhaustion*

In Claim IX, Bridges argues that the prosecutor committed repeated acts of misconduct during closing argument in the penalty phase. Third Am. Pet. 138.

The challenged comments also formed the basis for a prosecutorial misconduct claim raised by Bridges on direct appeal. <u>See</u> <u>Bridges I</u>, 757 A.2d at 879-81 (holding that comments did not prevent the jury from weighing the evidence objectively and that any prejudice was cured by cautionary instruction from trial court). The claim was supported by reference to federal law.

85

See Direct Appeal Br. 49 (citing Donnelly v. DeChristoforo, 416 U.S. 637, 640 (1974)).

Moreover, a claim of improper prosecutorial comment in closing argument is the sort of common

due process claim whose federal character would be apparent even without express reference to

federal law. See, e.g., Lesko v. Lehman, 925 F.3d 1527, 1541 (3d Cir. 1991) (discussing due

process limits on prosecutorial comment at capital sentencing). Bridges exhausted his available

state-court remedies with respect to Claim IX by presenting it on direct appeal.

***Merits Discussion***

      Bridges describes the prosecution's closing argument as problematic throughout, but he

identifies four comments as particularly troubling. First, the prosecutor appeared to inject his

own personal views of the death penalty into the proceedings and implied that he was required

by law to seek a capital sentence:

> May it please the Court. Ladies and gentlemen of the jury. I will be
> brief and to the point. As the District Attorney for Berks County, I
> represent the Commonwealth of Pennsylvania, the people of Berks
> County.
>
> This is perhaps one of my least pleasant duties but it is one which I
> must fulfill. It is one which the law requires and it is one which I strongly
> believe in. We have now reached the end of the penalty phase.

N.T. Vol. VII 1624-25 (emphasis added). Second, in Bridges' view, the prosecutor implied that

Bridges deserved the death penalty in part because of the general harm to the community of his

drug trafficking:

> In this case, did, based on the evidence, did the victims go to
> Shawn Bridges' apartment and attempt to steal his drugs and cash? We
> submit they did. Associated with, involved, or in competition. Using your
> three tools as we talked about yesterday, the evidence, the law, and your
> common sense, if you go to someone's home to steal their drugs and cash,
> certainly you're associated with, certainly you're in competition with and
> you're involved with.

> They went there to rip off his drugs and cash, plain and simple.
> The drugs, crack cocaine. You probably heard in this case from Mr.
> Robles, <u>things about a community that we only see in television. People
> distributing drugs on the street corner. What did Mr. Robles tell you when
> he was asked who do they sell drugs to? People you could walk out of the
> courthouse seeing walking by.</u> Crack cocaine, rock cocaine as he called it.
> A kilo of cocaine.

<u>Id.</u> at 1627 (emphasis added). Third, the prosecutor disparaged Bridges' mitigating evidence and

again referred to the general social harm of drug trafficking:

> He had opportunities, the defendant did. He had parents who loved him.
> He had people there who could help him, who could guide him, who could
> make a difference in his life. And we submit to you, what path did he
> choose? He is a man who made decisions who must be held accountable.
> Who must be responsible for his own actions. He is physically able to
> coach basketball. He is physically able to do things. And yes, he may have
> had a heart murmur as a teen-ager, as many teen-agers have[,] but he was
> treated. He is dealing with it, and he moved ahead and <u>a heart murmur
> does not give someone an excuse to sell crack cocaine[,] to peddle poison
> on our streets and to kill men in retaliation for trying to steal his drugs and
> his case.</u>

<u>Id.</u> at 1632 (emphasis added). Finally, the prosecution implied that Bridges had been one of the

actual shooters, as opposed to an accomplice of the shooting. <u>See id.</u> at 1628 (telling jurors that

"by your verdict yesterday [in the guilt phase], you found the defendant was either the killer or

an accomplice to the killing").

Bridges' claim for prosecutorial misconduct during the closing arguments at sentencing

was adjudicated on the merits by the Pennsylvania Supreme Court during his direct appeal.

<u>Bridges I</u>, 757 A.2d at 879-81. The court, reviewing the comments in light of the whole

argument, found "no comment so egregious that it would prejudice the jury to such an extent that

they could not weigh the evidence objectively." <u>Id.</u> at 880. The Pennsylvania Supreme Court also

noted that the trial court gave the following curative instruction after the closing argument:

> Personal opinions of either counsel or the Court have nothing to do with

87

> your decision and you should not consider them in any fashion
> whatsoever.
> . . . .
> Additionally, there was reference to the fact that by your verdict you
> found the defendant to have either been the killer or an accomplice of the
> killer of the two Banks cousins. As you recall from my instructions
> yesterday, Mr. Bridges was charged as an accomplice and he was found
> guilty as an accomplice.

Id. at 880-81 (quoting N.T. Vol. VII 1640-41).

As with many of his other claims, Bridges maintains that the state court failed to

adjudicate Claim IX on the merits because the state court applied only state-law standards and

the state-law standards are not consistent with federal law. Pet'r Mem. in Support of Pet. 73;

Pet'r Second Reply 48. For claims of improper prosecutorial argument, the Pennsylvania courts

have long asked whether the

> unavoidable effect [of the prosecutor's argument] would be to prejudice
> the jury, forming in their minds a fixed bias and hostility toward the
> defendant, so that they could not fairly weigh in his behalf such
> circumstances of doubt, extenuation, or degree of guilt that may be present
> in the case, and thus make them unable to render a true verdict.

Commonwealth v. Meyers, 139 A. 374, 377 (Pa. 1927); accord Bridges I, 757 A.2d at

880. This is sufficiently close to the federal standard that there can be no question that Bridges'

due process claim was adjudicated on the merits in state court, and thus § 2254(d) applies. See,

e.g., Marshall, 307 F.3d at 67 (asking whether "impact of the misconduct is to distract the trier of

fact and thus raise doubts as to the fairness of the trial" (emphasis omitted)).

The prosecutor's apparent injection of his own personal support for the death penalty into

the proceedings was improper, but it "is not enough that the prosecutors' remarks were

undesirable or even universally condemned." Darden, 477 U.S. at 181 (internal quotation marks

omitted). "The relevant question is whether the prosecutors' comments 'so infected the trial with

unfairness as to make the resulting conviction a denial of due process.'" Id. (quoting Donnelly,

416 U.S. at 643). It was not objectively unreasonable for the Pennsylvania Supreme Court to

conclude that the prosecutor's closing argument did not violate this permissive standard,

especially in light of the trial court's curative instruction. Cf. Moore v. Morton, 255 F.3d 95, 107

(3d Cir. 2001) (discussing effect of curative instruction). Regardless of the propriety of the

prosecutor's remarks, the court's curative instruction safeguarded the fundamental fairness of the

proceedings. Bridges is not entitled to habeas relief on Claim IX.

**J.       Claim X: Racial Composition of Jury Venire**

***Exhaustion***

        In Claim X, Bridges argues that he was denied his Sixth and Fourteenth Amendment

right to a jury trial because the petit jury was selected from a jury venire that did not represent a

fair cross-section of the Berks County community. Third Am. Pet. 142-43. According to Bridges,

African-Americans are systematically excluded from the jury selection process, even though that

process relies on facially race-neutral voter and motor-vehicle registration lists. Id. at 147.

        Prior to his trial, Bridges sought the expert assistance of a statistician "to assist him in

determining the 'representativeness of various classes in past and present jury arrays.'" Bridges

I, 757 A.2d at 867 (quoting Bridges' omnibus pretrial motion). Bridges' request for funding for

expert assistance was denied by the trial court, and the trial court's decision was affirmed on

appeal. Id. at 867-68.

        Bridges relies on the statistician-related portion of his direct appeal brief for exhaustion

of Claim X. Pet'r Second Reply 17. The Commonwealth argues that Bridges' direct appeal claim

pertained solely to the denial of funding for expert assistance and that Bridges did not actually

argue that the jury pool was unrepresentative. Commw. Mem. 20.

The denial of funding was only relevant because of Bridges' underlying contention that the Berks County jury pool did not contain a fair cross-section of the community, and Bridges fairly apprised the state court of that underlying constitutional contention by citing cases about under-representation. See Direct Appeal Br. 3 (citing Commonwealth v. Carver, 688 A.2d 691 (Pa. 1997), and Commonwealth v. Edwards, 426 A.2d 550 (Pa. 1991)). The Pennsylvania Supreme Court clearly understood the import of the claim. See Bridges I, 757 A.2d at 868 ("This Court has repeatedly rejected the argument that a jury pool chosen from voter registration lists does not represent a fair cross section of the community."). Claim X was fairly presented to the state courts on direct appeal.

***Merits Discussion***

This Sixth Amendment claim was adjudicated on the merits by the Pennsylvania Supreme Court, which relied on its own settled view that "'a criminal defendant may not attack the racial composition of jury panels drawn from voter registration lists on the theory that blacks are underrepresented in voter lists' because such computer generated lists are compiled without regard to race." Bridges I, 757 A.2d at 868 (quoting Commonwealth v. Henry, 569 A.2d 929, 933 (Pa. 1990)).

Bridges now argues that the state-court decision was contrary to and an unreasonable application of federal law because federal law does not require any showing of discriminatory intent. Pet'r Mem. in Support of Pet. 76. The state court failed to appreciate, in his view, that the discriminatory effect of the state's chosen methodology for selecting a jury pool could be enough to violate the Sixth Amendment.

Assuming arguendo that Bridges is correct in saying that the state court failed to apply the correct federal standard, he still fails to make a sufficient prima facie case of a Sixth

Amendment violation relating to the jury pool. Since at least <u>Taylor v. Louisiana</u>, 419 U.S. 522,

528 (1975), it has been clearly established that the Sixth Amendment requires "the selection of a

petit jury from a representative cross section of the community." <u>See also</u> <u>Norris v. Alabama</u>,

294 U.S. 587, 590-96 (1935) (reversing criminal conviction where jury roll systematically

excluded African-Americans). The standards for such a claim are definitively set forth in <u>Duren</u>

<u>v. Missouri</u>:

> In order to establish a prima facie violation of the fair-cross-section
> requirement, the defendant must show (1) that the group alleged to be
> excluded is a "distinctive" group in the community; (2) that the
> representation of this group in venires from which juries are selected is not
> fair and reasonable in relation to the number of such persons in the
> community; and (3) that this underrepresentation is due to systematic
> exclusion of the group in the jury-selection process.

439 U.S. 357, 364 (1979). "A defendant need not show discriminatory intent." <u>United States v.</u>

<u>Weaver</u>, 267 F.3d 231, 237 (3d Cir. 2001) (citing <u>Duren</u>, 439 U.S. at 368 n.26).

The first element of a fair-cross-section claim is not in doubt. <u>See</u> <u>Ramseur v. Beyer</u>, 983

F.2d 1215, 1230 (3d Cir. 1992) (en banc) ("African-Americans are unquestionably a

constitutionally cognizable group."). But Bridges has not demonstrated in either state or federal

proceedings that African-Americans were systematically under-represented in Berks County jury

pools at the time of this trial; at the very least, the Pennsylvania Supreme Court could reasonably

conclude that Bridges had failed to make such a showing to support his <u>prima facie</u> case.

Ordinarily this showing requires statistical evidence, and Bridges has put forth none. <u>See</u>

<u>Ramseur</u>, 983 F.2d at 1234-35 (finding two years of studies to be inadequate, at least where jury

selection process was facially race-neutral); <u>see also</u> <u>Weaver</u>, 267 F.3d at 241-44 (discussing

permissible statistical methods).[21] He alleges on information and belief that there were no African-Americans on the 128-person jury panel in his case despite the fact that 4% of the population of Berks County is African-American. Third Am. Pet. 142. The <u>Duren</u> test looks not just to the jury venire in the petitioner's individual case but rather to a pattern or history of jury venires from which valid statistical inferences might be drawn. No doubt Bridges would fault the Commonwealth for the lack of statistical data; he alleges in this context that Berks County keeps no records of the race of persons called for jury duty. Third Am. Pet. 280; Pet'r Mem. in Support of Pet. 75-76. But the burden of making a <u>prima facie</u> case is his to carry. Bridges is not entitled to habeas relief on Claim XI.

## K.  Claim XI: Jury Pool Tainted by Pretrial Publicity

### *Exhaustion*

In Claim XI, Bridges argues that he was denied his Sixth and Fourteenth Amendment jury trial right when the trial court refused to grant his pretrial motion for a change of venue or venire on the ground that the Berks County jury pool was tainted by pretrial publicity about the Banks murders. Third Am. Pet. 150-52.

This claim was also fairly presented to the Pennsylvania Supreme Court in Bridges' direct appeal. <u>See</u> <u>Bridges I</u>, 757 A.2d at 871-72 (holding that pretrial publicity did not prevent

---

[21]The only gesture in this direction is Bridges' citation of the <u>Final Report of the Pennsylvania Supreme Court Committee on Racial and Gender Bias in the Justice System</u> (2003), <u>available at</u> http://www.pa-interbranchcommission.com/_pdfs/FinalReport.pdf. Third Am. Pet. 147. The <u>Final Report</u> was published after Bridges' fair-cross-section claim was adjudicated on the merits by the Pennsylvania Supreme Court and thus was not considered by that court. Assuming that it may even be consulted as a factual basis for Bridges' Sixth Amendment claim, the <u>Final Report</u> is at best equivocal. <u>See</u> <u>Final Report</u> 54 (noting that "lack of reliable data" hampered efforts); <u>id.</u> at 60-61 (first phase of jury study "found roughly proportional representation in most counties"); <u>id.</u> at 68-70 (second phase of study found under-representation of African-Americans but did not examine Berks County).

the selection of a fair and impartial jury). Although Bridges' direct appeal brief relies only on

state precedents, those precedents are themselves applications of the relevant federal standard.

See, e.g., Commonwealth v. Rucci, 670 A.2d 1129, 1141 (Pa. 1996) (citing Irvin v. Dowd, 366

U.S. 717, 722 (1961)). Therefore, I will proceed to address the merits of the claim.

***Merits Discussion***

Ordinarily the voir dire should function to screen out jurors who cannot be impartial in a

defendant's case because of their exposure to pre-trial publicity. But in extraordinary cases,

"adverse pretrial publicity can create such a presumption of prejudice in a community that the

jurors' claims that they can be impartial should not be believed." Patton v. Yount, 467 U.S. 1025,

1031 (1984) (citing Irvin v. Dowd, 366 U.S. 717 (1961)); see also Rock v. Zimmerman, 959 F.2d

1237, 1252 (3d Cir. 1992) ("Where media or other community reaction to a crime or a defendant

engenders an atmosphere so hostile and pervasive as to preclude a rational trial process, a court

reviewing for constitutional error will presume prejudice to the defendant without reference to an

examination of the attitudes of those who served as the defendant's jurors."). Bridges argues that

such a wave of sensational media coverage engulfed Berks County prior to his trial.

This claim was adjudicated on the merits by the Pennsylvania Supreme Court in Bridges'

direct appeal. The state court held that Bridges had failed to make the high showing required to

establish a presumption of prejudice. Bridges I, 757 A.2d at 872. In particular, the state court

noted that although 75 members of the 128-person jury panel reported some knowledge about the

case, only 15 had formed any opinion about the case at all—all of whom were excused for cause.

Id.

Of course, the premise of Irvin v. Dowd is that pretrial publicity may become so

overwhelming in a community that jurors who disclaim bias cannot be believed. But the

93

Pennsylvania Supreme Court's determination that no such media-driven mania overwhelmed

Berks County is neither contrary to nor an unreasonable application of clearly established federal

law. Bridges points to several newspaper articles; media reports that attended the earlier

conviction of his co-defendant, Roderick Johnson, for the same murders; and the

Commonwealth's contemporaneous agreement to a change of venire in the trials of Johnson and

Richard Morales for an unrelated murder. Third Am. Pet. 151. That is a far cry from the sort of

extraordinary publicity found to give rise to a presumption of prejudice. Compare Irvin, 366 U.S.

at 725 (granting relief where there had been a "barrage of newspaper headlines, articles, cartoons

and pictures . . . during the six or seven months preceding" trial which revealed the petitioner's

confession and offer to plead guilty), and Murphy v. Florida, 421 U.S. 794, 798-99 (1975)

(collecting cases), with Patton, 467 U.S. at 1032-33 (denying relief despite extensive local media

coverage of first conviction prior to petitioner's re-trial), and Mu'Min v. Virginia, 500 U.S. 415,

429-30 (1991) (similar). As the state court opinion was not contrary to or an unreasonable

application of these federal standards, Bridges is not entitled to relief on Claim XI.

## L.     Claim XII: Court Errors During Jury Selection

In Claim XII, Bridges argues that he was denied his Sixth and Fourteenth Amendment

right to a jury trial by various errors in voir dire. Third Am. Pet. 153. He claims that the trial

court erred by: limiting the questions posed to potential jurors, id. at 154; excluding for cause a

juror who expressed personal reservation about the death penalty, id. at 156-57; and failing to

exclude for cause a juror who stated that he was a former police commissioner in a township in

Berks County, id. at 160.

Each of these putative defects in the process of jury selection was fairly presented to the

Pennsylvania Supreme Court in Bridges' direct appeal. See Bridges I, 757 A.2d at 872 (holding

94

that trial court did not abuse its discretion in limiting voir dire); id. at 873-74 (holding that trial

court's decisions as to two specific jurors were also not an abuse of discretion). Bridges thus

exhausted his available state-court remedies for Claim XII, and I may evaluate these claims on

the merits.

***Merits Discussion***

### 1.  Restrictions on Petitioner's Proposed Voir Dire Questions

Bridges' first voir dire claim is that the trial court violated his Sixth and Fourteenth

Amendment rights by limiting the questions that he proposed be addressed to potential jurors.

Third Am. Pet. 153-54. Although Bridges' petition refers generally to all of his proposed voir

dire questions, he identifies two exemplary ones that he claims should have been put to potential

jurors: whether the jurors were aware of any recent cases in which the death penalty had been

imposed, and whether the jurors would bring anything they recalled about prior proceedings

involving Bridges to the court's attention if they happened to recall something during the trial.

Third Am. Pet. 154; see also Def.'s Am. Individual Voir Dire Questions (41 proposed questions).

The Pennsylvania Supreme Court discussed only the latter question specifically, holding

that Bridges "failed to establish, or even to argue that the denial [of this question] by the trial

court . . . prejudiced him." Bridges I, 757 A.2d at 872. The state court also indicated that it had

undertaken an independent review of the entire voir dire and had determined that "the trial court

properly exercised its discretion in ensuring that a fair and impartial jury tried Appellant." Id.

As a matter of federal law, "[t]he Constitution . . . does not dictate a catechism for voir

dire, but only that the defendant be afforded an impartial jury. Even so, part of the guarantee of a

defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors."

Morgan v. Illinois, 504 U.S. 719, 729 (1992). "Hence, the exercise of the trial court's discretion,

and the restriction upon inquiries at the request of counsel, are subject to the essential demands of fairness." Id. (internal quotation marks and alterations omitted).

The Pennsylvania Supreme Court correctly identified this standard and reviewed the trial court's decision on voir dire questions for abuse of discretion to ensure that the defendant was tried by a fair and impartial jury. See Bridges I, 757 A.2d at 872 (citing Commonwealth v. Marrero, 687 A.2d 1102, 1107 (Pa. 1996) (discussing Morgan, 504 U.S. 719)). It cannot be said that the state-court decision was objectively unreasonable, in light of the extensive and thorough voir dire that did occur. See N.T. Vol. I 16-22 (trial court's explanation for refusing to ask several of defendant's proposed voir dire questions). Bridges is not entitled to habeas relief on this claim.

### 2.  Excusal of Juror Kubacki for Cause

Bridges' second voir dire claim is that his right to a fair and impartial jury was violated when the trial court excused potential Juror Kubacki for cause after she expressed reservation concerning the death penalty. Third Am. Pet. 154-56. Juror Kubacki responded affirmatively to a general question as to whether "any moral, religious, or ethical beliefs" would prevent her from considering the imposition of the death penalty if the defendant were found guilty. N.T. Vol. I 63-65. At an individual voir dire, the following colloquy occurred:

| | |
|---|---|
| KUBACKI: | Well, I just feel as though I cannot make a decision. I cannot make the choice of putting somebody else to death. |
| D.A. BALDWIN: | Today is the only chance we get to talk to you and we all come to court with our own beliefs and concerns. But we're looking for people who can come to the issue of capital punishment or the death penalty with an open mind. |
| KUBACKI: | Okay. |

| | |
|---|---|
| D.A. BALDWIN: | Are your concerns . . . so strong that regardless of what the Court says is the law in Pennsylvania, in your heart you could not consider imposing the death sentence? |
| KUBACKI: | I don't think I would have a problem with it if the Court felt that it was absolutely the only decision that could be made. |
| THE COURT: | Well, in this type of particular situation, the jury makes two decisions or possibly two decisions. . . . Without getting into any of the details, you will be given and instructed on the law and then ultimately the jury then imposes the sentence. The Court really doesn't impose the sentence, nor does the Court tell you what sentence to impose. But the jury would be the one sentencing. And the question is, because of any moral, religious or personal beliefs that you may have, would you be unable to consider imposing the death penalty if it got to that point and you were a member of this jury? |
| KUBACKI: | I think I would find it difficult to personally convict somebody and say that they had to be put to death. |
| THE COURT: | Well, I'm sure it's not a real easy thing. I would not think that it would be an easy thing to do. So it would be a difficult question. The thing that you have to look at and tell us, is would you be unable to do that if the law in Pennsylvania as applied to the facts as you found them in the penalty phase would require it? |
| KUBACKI: | I probably would find it difficult to do that, yes, unable to do that. |
| THE COURT: | Unable to do that? |
| KUBACKI: | Unable to do that. |

N.T. Vol. II 429-30. After this exchange, the trial court granted the Commonwealth's motion to

excuse Juror Kubacki for cause. Id. at 431.

On direct appeal, the Pennsylvania Supreme Court determined that Juror Kubacki was properly excused for cause. See Bridges I, 757 A.2d at 873. That decision is neither contrary to nor an unreasonable application of clearly established federal law. A juror who "is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause." Uttecht v. Brown, 551 U.S. 1, 9 (2007) (summarizing Witherspoon v. Illinois, 391 U.S. 510 (1968) and Wainwright v. Witt, 469 U.S. 412 (1985)). The trial court's judgment as to whether a juror would be substantially impaired is owed deference on appellate review, in addition to the deference that must be accorded in habeas under AEDPA. Id. at 9-10.

Bridges relies heavily on Juror Kubacki's initial comment that she did not "think [she] would have a problem with it if the Court felt that it was absolutely the only decision that could be made." Third Am. Pet. 156; Pet'r Mem. in Support of Pet. 81. After it was explained to her that she as a juror—and not the court—would need to decide whether to impose the death penalty, she stated that she would be unable to follow the law. It was not objectively unreasonable for the Pennsylvania Supreme Court to find that the trial court was well within its discretion in excusing her for cause.

### 3.  Failure to Excuse Juror Keim

Bridges' final voir dire claim is that Juror Keim should have been excused for cause because he was presumptively biased against Bridges. Third Am. Pet. 160. Juror Keim reported during voir dire that he "remember[ed] reading about the incident [i.e., the Banks killings] in the paper" but could not recall any specific details. N.T. Vol. III 648. He also stated that he had served for ten years as a police commissioner in Colebrookdale Township, in Berks County, but that he had retired two years prior to Bridges' trial. Id. at 650. Finally, he stated that he was personally friends with several attorneys and with a judge in Berks County. Id. But nothing in the

voir dire indicates that he had any personal knowledge of the Banks murders or any familiarity with any lawyer or witness in the case. See id. at 648-57.

Bridges maintains that a "conclusive presumption of implied bias" arose given Juror Keim's former employment as a police commissioner and personal friendships with attorneys and a judge not involved in the case. Third Am. Pet. 160 (quoting Smith v. Phillips, 455 U.S. 209, 223 (1982) (O'Connor, J., concurring)). But it was objectively reasonable for the state court to conclude that no such presumption of bias arose in this case, given that Juror Keim professed no personal relationship with anyone actually involved. Cf. Smith, 455 U.S. at 222 (O'Connor, J., concurring) (suggesting that a presumption of bias might arise where "the juror is an actual employee of the prosecuting agency . . . [or] a close relative of one of the participants in the trial of the criminal transaction"); Turner v. Louisiana, 379 U.S. 466, 468-70 (1965) (presumption of bias where two police witnesses were also responsible for sequestering jury for days). Bridges is not entitled to habeas relief on this or any aspect of Claim XI.

## M.    Claim XIII: Lethal Injection Drugs

### *Procedural Default*

Bridges freely admits that Claim XIII of Bridges' Third Amended Petition was never presented to the state courts. Bridges alleges that the state's protocol of lethal injection drugs and the secrecy surrounding that protocol violate the First, Eighth, and Fourteenth Amendments. Third Am. Pet. 161 n.101, 166. As a result, the claim is procedurally defaulted, as the deadline for filing a PCRA petition has long since passed. Therefore, I may only reach the merits of the claim if Bridges can show cause for his default and resulting prejudice.

Bridges argues that he was not required to present the claim to the state courts until he was facing imminent execution. Pet'r Mem. in Support of Pet. 85. But this claim was ripe at least

by December 21, 2005, when the governor of Pennsylvania signed a warrant to execute Bridges,

and the state laws and policies underlying Claim XIII were a matter of public record by that date.

See Third Am. Pet. 162-66 (describing basis of claim). The claim could have been but was not

presented to the state courts. Furthermore, in light of the time limitations in 42 Pa. Cons. Stat.

Ann. § 9545(b), any attempt to present this claim to the state courts now would be futile. Bridges

has not suggested any cause for his failure to present the claim in state-court in a timely manner.

Claim XIII is therefore procedurally defaulted, and I cannot reach the merits of the claim.

**N.    Claim XIV: Cumulative Error**

***Procedural Default***

Bridges also acknowledges that he did not present the state courts with Claim XIV,

alleging that cumulative errors in his case warrant relief. Third Am. Pet. 177-78. In Bridges'

view, Claim XIV need not have been exhausted because a habeas court can always grant relief

based on the cumulative effect of errors. Pet'r Second Reply 17-18.

Several federal courts have disagreed and have treated cumulative error as a distinct

claim for purposes of exhaustion and procedural default. E.g., Bunton v. Atherton, 613 F.3d 973,

990 (10th Cir. 2010); Jimenez v. Walker, 458 F.3d 130, 149 (2d Cir. 2006); cf. Albrecht v. Horn,

485 F.3d 103, 139 n.17 (3d Cir. 2006) (treating cumulative error as independent claim for

purposes of 28 U.S.C. § 2254(d)(1) without discussing exhaustion). Under these authorities,

Claim XIV is unexhausted and defaulted insofar as it purports to state an independent basis for

habeas relief. It therefore cannot be the basis of federal habeas relief.

**O.    Claim XV: Post-trial Destruction of Evidence**

Bridges also argues that the prosecution destroyed, in bad faith, both a gun permit issued

to George Robles and Robles' application for the permit. Id. at 213-14.[22]

### 1. Claim XV.A: Bad Faith Destruction of the Van

*Exhaustion*

In Claim XV.A, Bridges argues that the prosecution destroyed potentially exculpatory evidence, in bad faith, during his direct appeal. Third Am. Pet. 179.[23] The factual basis for this claim is that the prosecution allegedly directed or authorized the destruction in March 1999 of the van in which the Banks cousins were shot. Id. at 189.

During his second PCRA petition, Bridges fairly presented his claim to the state courts that the prosecution destroyed the van in bad faith during his direct appeal and that the van was potentially exculpatory evidence. See Bridges III, slip op. at 5-9 (finding claim to be untimely). Indeed, exhaustion of this claim was the avowed purpose of filing the second PCRA petition. Pet'r Mot. to Stay 4 ¶ 10 (Doc. No. 115).

The fact that Bridges' claim was found to be untimely by the state courts is irrelevant for purposes of exhaustion. "Whether or not the petition was untimely goes to the issue of procedural default, not exhaustion." Baker v. Horn, 210 F. Supp. 2d 592, 628 n.32 (E.D. Pa. 2002). Even an untimely petition gives the state courts a fair opportunity to pass on the petitioner's federal claims. Id. Bridges thus exhausted his available state-court remedies as to his

---

[22] Bridges' petition contains what might be read as a third sub-claim under the heading of Claim XV, alleging that the state courts failed to afford him meaningful post-conviction review because of the legal standard applied in adjudicating his destruction-of-evidence claim. Third Am. Pet. 211-13. To the extent that this is intended to state an independent federal claim for relief, it is unexhausted. This section of the petition is more naturally read as an argument that the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1).

[23] Claims XIII and XIV are examined below in the discussion of procedural default. Bridges concedes that these claims were not presented to the state courts at any juncture.

claim that the prosecution destroyed the van in bad faith. However, because the state court determined that the claim was untimely, it is procedurally defaulted, and I may only proceed to the merits if Bridges can show cause and prejudice.

***Procedural Default***

###    a.  Independent and Adequate State-Law Ground

As a threshold matter, Bridges disputes whether his <u>Youngblood</u> claim was actually defaulted in state court. The Court of Common Pleas held that the claim was untimely under Pennsylvania law but addressed the merits of the claim "in the interest of being thorough." <u>Bridges III</u>, slip op. at 9. The Pennsylvania Supreme Court summarily affirmed in a per curiam decision. In Bridges' view, it is not clear from the record which of the two holdings of the lower court—timeliness or denial on the merits—formed the basis for the Pennsylvania Supreme Court's decision. Pet'r Supp. Mem. 28-29; Pet'r Second Reply 55. He urges that the claim be treated as though the state court forgave any default and decided it on the merits.

That route is foreclosed by precedent. When the last state court to render judgment on the claim summarily affirms, the habeas court "should look to the 'last <u>explained</u> state-court judgment on the . . . claim'" to evaluate whether a procedural default occurred. <u>Johnson</u>, 392 F.3d at 557 (quoting <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 802 (1991)). The last explained state-court judgment was issued by the Court of Common Pleas, during Bridges' second PCRA litigation, which expressly rested its judgment on state procedural rules. <u>Bridges III</u>, slip op. at 9, 16. The fact that the Court of Common Pleas also went on to address the merits of the <u>Youngblood</u> claim does not remove the procedural bar to relief:

> [A] state court need not fear reaching the merits of a federal claim in an <u>alternative</u> holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding

> that is a sufficient basis for the state court's judgment, even when the state
> court also relies on federal law.

Harris v. Reed, 489 U.S. 255, 264 n.10 (1989). So the issue is whether the timeliness ruling was

an independent and adequate state-law ground to deny relief, notwithstanding the state court's

gratuitous discussion of the merits.

The state court found Bridges' claim to be untimely under 42 Pa. Cons. Stat. Ann. §

9545(b), which ordinarily requires that post-conviction claims be raised within one year of final

judgment in the petitioner's criminal case. Bridges' criminal conviction became final for these

purposes on May 28, 2002, when the Supreme Court of the United States denied his petition for

a writ of certiorari. Id. § 9545(b)(3); Bridges v. Pennsylvania, 535 U.S. 1102 (2002). Bridges'

second PCRA petition, filed in 2008, fell well outside the one-year rule. But the statute provides

three exceptions from the one-year rule, and Bridges contended that he met two of them. Bridges

III, slip op. at 7; Second PCRA Pet. 32. The pertinent exceptions require the petitioner to show

that:

> (i) the failure to raise the claim previously was the result of interference by
> government officials with the presentation of the claim in violation of the
> Constitution or laws of this Commonwealth or the Constitution or laws of
> the United States; [or]
>
> (ii) the facts upon which the claim is predicated were unknown to the
> petitioner and could not have been ascertained by the exercise of due
> diligence . . . .

42 Pa. Cons. Stat. Ann. § 9545(b)(1). A petitioner who invokes either of these exceptions must

file a PCRA petition within 60 days "of the date the claim could have been presented." Id. §

9545(b)(2).

Bridges filed his second PCRA petition on December 12, 2008. Bridges III, slip op. at 2.

The state court determined that he could have presented his Youngblood claim more than 60

103

days before that date: Bridges himself stated in federal pleadings that he learned of the alleged destruction of evidence at least by October 2007, over one year before he returned to state court with his second PCRA petition. Id. at 8. On October 31, 2007, Bridges filed an amendment to his federal habeas corpus petition, alleging that his habeas counsel learned on October 30, 2007, "that the evidence was destroyed and that the District Attorney permits police agencies to destroy physical evidence and documents one year after the case concludes the direct appeal process." Pet'r Am. to Pet. for Writ of Habeas Corpus 27 ¶ 369 (Doc. No. 55); see also id. ¶ 371 (arguing that destruction of evidence violated Youngblood). The PCRA court also reasoned that Bridges could have discovered the alleged destruction of the van in the exercise of due diligence and that Commonwealth officials did not interfere with any effort he may have made to do so. Bridges III, slip op. at 8-9.

The time limitations in 42 Pa. Cons. Stat. Ann. § 9545(b) form an independent and adequate state-law ground for the state court's judgment denying relief. Whitney, 280 F.3d at 250-53. At one time, this may not have been true in capital cases because the Pennsylvania courts relaxed certain state procedural rules in capital cases. See Banks, 126 F.3d at 214 (discussing state practice). But the state courts have subsequently made clear that the time limitations in § 9545(b) are mandatory, jurisdictional, and "strictly enforced in all cases." Whitney, 280 F.3d at 251 (citing Commonwealth v. Peterkin, 722 A.2d 638, 642 (Pa. 1998)).

Bridges has not undertaken to demonstrate how or why the time limitations in § 9545(b) fail to constitute an independent and adequate state-law ground for the state court's judgment. Instead, he argues that the state court's application of § 9545(b) was incorrect because it was "directly disputed by clear and convincing evidence." Pet'r Supp. Mem. 29; see also Pet'r Second Reply 55 ("[T]he state court's timeliness finding was based on an erroneous and

objectively unreasonable determination of the facts and is contradicted by clear and convincing evidence in the record."). That is the language of 28 U.S.C. § 2254(d) and (e), which pertain to habeas review of a state court's decision on a petitioner's <u>federal</u> claims. Whether Bridges complied with the state's procedural rule is a question of state law that cannot be relitigated in habeas proceedings—at least as long as the state procedural rule is truly independent of federal law and is itself an adequate ground to support the state court's judgment.

Even if Bridges' attack on the fact-finding of the PCRA court were charitably construed as an argument about the adequacy of the state court's procedural ruling, the argument would fail. "Ordinarily, violation of 'firmly established and regularly followed' state rules . . . will be adequate to foreclose review of a federal claim." <u>Lee v. Kemna</u>, 534 U.S. 362, 376 (2002) (quoting <u>James v. Kentucky</u>, 466 U.S. 341, 348 (1984)). Nothing about the state court's application of the state procedural rule appears to be so exorbitant or extraordinary as to render the state rule inadequate. <u>See</u> <u>id.</u>

Because § 9545(b) is both an independent and adequate state-law ground, Bridges' failure to comply with the state rule bars federal habeas relief unless he can show cause for his default and resulting prejudice or a fundamental miscarriage of justice.

### b.  Cause and Prejudice

Bridges has developed an argument concerning cause and prejudice, though he does not claim any fundamental miscarriage of justice. Pet'r Supp. Mem. 31-32; <u>see also</u> Pet'r Second Reply 55-61. Understanding his argument requires delving into the record concerning the van and its destruction.

The evidence at trial showed that, after the Banks cousins' bodies were pulled out of the van, Bridges drove the vehicle alone to a deserted street corner in Reading, where he "poured

gasoline in the van and set a match to it, completely gutting the van." Bridges I, 757 A.2d at 866; see also N.T. Vol. IV 1030 (Bridges' statement to police admitting that he burned van with gasoline). The police were nevertheless able to locate some inculpatory evidence in the van, including a bullet and shell casing. Bridges I, 757 A.2d at 866. Additionally, as already described in the context of exhaustion, the Commonwealth presented testimony from Fire Marshal Terry Francis concerning his examination of the charred van; Francis claimed to have traced the path of what proved to be a 9 millimeter bullet from the front passenger seat area—where Bridges was located at the start of the shooting—towards the victims in the middle seats of the van. N.T. Vol. IV 942. Photographs of the charred van were also entered into evidence. Id. at 891, 900-01, 943.

Bridges was convicted and sentenced to death in February 1998. After post-trial proceedings in the Court of Common Pleas, Bridges filed the opening brief in his direct appeal to the Pennsylvania Supreme Court on March 19, 1999. His brief argued in part that the trial court had erred in denying his pre-trial request for funds to hire an expert ballistics witness. Direct Appeal Br. 4. He did not say that a ballistics expert would have examined the van itself—as opposed to the bullet and casing found therein—but that suggestion was implied by his general plea for expert forensic assistance.

The van was in the possession of the Exeter police after the conclusion of Bridges' trial. According to records which came to light during the present federal proceedings, the Exeter police attempted to return the van to its registered owner, to no avail, in March 1999. See Second Am. Pet., Ex. 51, Doc. No. 102-4, at 50-51. The police then contacted the District Attorney's office and were advised by then-District Attorney Mark Baldwin that the van had no further evidentiary value and could be released for salvage. Id. The van was towed to a salvage company

on or around March 29, 1999. Id.  Baldwin denied any recollection of this conversation during a hearing in state court on Bridges' second PCRA petition. N.T. PCRA Hearing II 107-08. The van was presumably salvaged for parts in March 1999, during Bridges' direct appeal.

In habeas proceedings, Bridges retained the services of a putative forensic expert to review the trial evidence. Bridges then requested access to the photographs presented at trial—including photographs of the van—but he was given the runaround. The District Attorney's office told him that it did not maintain control of evidence generated by police agencies. See Pet'r Mot. for Discovery, Ex. B, Doc. No. 13-1, at 12-14 (letter of July 24, 2006, from Assistant District Att'y Douglas Waltman). So Bridges contacted the Exeter police, who told him that they had been instructed by the District Attorney's office to direct all requests related to Bridges' case to the District Attorneys' office. See Pet'r Second Mot. for Discovery, Ex. A, Doc. No. 19-1, at 2 (letter of Sept. 5, 2006, from Police Chief Christopher Niedert). Ultimately, Bridges received the photographs pursuant to a discovery order entered by this Court. Third Am. Pet. 186.

Bridges' forensic expert examined the photographs taken of the van and concluded that the trial testimony of Fire Marshal Terry Francis had been flawed. Third Am. Pet. 186. Bridges then requested that his expert have access to the van itself. In the course of scheduling an in-person inspection of evidence, Bridges learned on October 30, 2007, that the van had been destroyed. Id. at 183.

Bridges filed an amendment to his habeas corpus petition the following day, October 31, 2007, in accord with a pre-existing deadline. His amended petition alleged that the van was destroyed in violation of Youngblood. As now developed in the Third Amended Petition, Bridges' claim is that the van was potentially exculpatory because it could have been used to

undermine the prosecution's forensic case.[24] To show bad faith—as required by Youngblood, see 488 U.S. at 57-58—Bridges relies on, inter alia: the timing of the destruction of the van, which occurred shortly after he filed a direct appeal brief raising the issue of denial of funding for expert forensic assistance; the apparent violation of the District Attorney's own stated evidence-retention policy, which was to preserve evidence at least until one year after the conclusion of direct appeal proceedings; and the Commonwealth's failure to be forthcoming about the circumstances of the destruction of the van during these federal proceedings. Third Am. Pet. 196-209.

Why Bridges could not have brought this claim to state court much earlier, when he raised it in federal court, remains a mystery. Bridges argues that he did not return to state court in October 2007 because he was affirmatively misled into believing that the van had not been destroyed by the Commonwealth's federal filings. Pet'r Supp. Mem. 29-30. On November 30, 2007, the Commonwealth represented in a federal court that:

> The Commonwealth **_never_** stated that any evidence was destroyed and the Petitioner has **_never_** identified any evidence that they believe was destroyed. Counsel for the Petitioner was informed that as a general matter police agencies are permitted to destroy evidence one year after the conclusion of the appellate process. No representation was made that that was the directive of the District Attorney's Office in this case.

Commw. Resp. in Opp. 45 ¶ 369, Doc. No. 61 (original emphasis). The Commonwealth made a

---

[24] According to Bridges, his expert's review of the photographs indicates that the rear seat of the van was missing when Francis inspected the vehicle and purported to trace a linear bullet path from the front passenger seat to the rear driver-side wheel well. Third Am. Pet. 186. At the time of the crime, the rear seat would have been in the path of the bullet and could have affected its trajectory. Bridges also claims that, had his expert been given access to the van, the expert could have determined whether the front passenger window of the van was open or closed at the time of the shooting, which in turn may have been used to corroborate Bridges' theory that Roderick Johnson shot the victims with a 9 millimeter gun from outside the van. Id. at 41-42.

similar denial in opposing a discovery request the following month. Commw. Ans. to Pet'r Third

Mot. for Discovery 5 ¶ 16, Doc. No. 56.

Both of these filings were signed by Assistant District Attorney Jason Lutcavage. It was

also Lutcavage who informed Bridges on October 30, 2007, that the van had been released to

salvage. Third Am. Pet. 201-02. The discrepancy appears to be a matter of semantic quibbling,

with Lutcavage insisting that he told the petitioner that the van was not in the Commonwealth's

custody and had been released to salvage, not that it necessarily had been destroyed. Bridges III,

slip op. at 8; Commw. Mem. 29-30; Pet'r Second Reply 56. In Bridges' telling, but for

Lutcavage's misleading federal filings, Bridges would have filed a second PCRA petition within

60 days of the October 2007 discovery. Pet'r Supp. Mem. 31. And he did in fact file his second

PCRA petition within 60 days of receiving the Exeter township police report that confirmed that

the van had been sent to salvage in March 1999.

Bridges' argument for cause is unavailing. It is clear from the federal record that Bridges

was not persuaded or misled by the Commonwealth's denials. Instead, he continued to believe

throughout post-October 2007 federal proceedings that the van had been destroyed. On

December 26, 2007—within 60 days of the October 30 discovery—Bridges filed his

consolidated traverse to the Commonwealth's answer to his amended habeas petition in this

Court. In the traverse, he again asserted that the van was destroyed in violation of Youngblood.

Pet'r Cons. Traverse 51-52, Doc. No. 68; see also id. Ex. B at 2 ¶¶ 6-7, Doc. No. 68-1 (affidavit

of defense counsel stating that she was told by ADA Lutcavage on October 30, 3007, that "'he

knew for a fact' that the van had long since been destroyed"). If Bridges could assert a

Youngblood claim in federal court in October and December 2007, there is no plausible reason

why he could not have done so in state court at that time. He has not shown good cause for his

failure to comply with the state's procedural rules.

Moreover, even if Bridges were able to show good cause for failing to comply with the 60-day time period, he has not shown prejudice flowing from the allegedly bad-faith destruction of the van in March 1999 during his direct appeal. Had the District Attorney's office followed its own stated evidence-retention policy, it appears that the van would have been destroyed within one year of the conclusion of Bridges' direct appeal—i.e., in May 2003, well before Bridges asserted that the van had any potentially exculpatory value. Bridges hypothesizes that he could have obtained a protective order to prevent the destruction of the van had the District Attorney not "concealed his intent to destroy" it, see Pet'r Supp. Mem. 36, but there is no evidence that Bridges had any interest in examining the van itself until after habeas proceedings commenced in 2006.

Bridges' failure to assert that the van had any potentially exculpatory value until habeas proceedings is relevant for an additional reason. Prior to Bridges' renewed interest in the van, there is little reason to suppose that the Commonwealth thought it had any potentially exculpatory value. If the Commonwealth did not think that the van was potentially exculpatory, Bridges cannot show bad faith. See Youngblood, 488 U.S. at 56 n.* ("The presence or absence of bad faith by the police . . . must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed."). As far as the record reveals, the Commonwealth believed that the van provided evidence of Bridges' guilt. According to the prosecution, the van showed that a 9 millimeter bullet had been fired from the front passenger seat area towards the victims, and the burning of the van after-the-fact in an apparent effort to destroy evidence showed Bridges' consciousness of guilt. Cf. Illinois v. Fisher, 540 U.S. 544, 548 (2004) (finding no bad faith when police destroyed evidence they believed to be

inculpatory).

Finally, as a practical matter, it bears repeating that Bridges had access to the van prior to and during his trial and continues to have access to photographs of the van. Cf. Brown v. Rapelje, Civ. No. 08-151, 2009 WL 6608173, at *24 (W.D. Mich. May 26, 2009) (destruction of vehicle in which victim was killed did not violate Youngblood in part because defendant had other evidence concerning the vehicle, including detailed photographs). Although he now claims that his pre-trial access to the van was illusory without expert forensic assistance, his principal contention—that the presence or absence of the rear seat of the van would have affected the trajectory of the bullet path traced by Fire Marshal Francis—appears to be the sort of lay proposition that his trial counsel could have pursued in cross-examination even without expert assistance.

Bridges has not shown good cause for his default or prejudice flowing from the asserted Youngblood violation. Therefore, his procedural default of this claim in the state courts will not be set aside.

## 2. Claim XV.C: Bad Faith Destruction of Robles' Gun Records

### *Exhaustion*

In Claim XV.C, Bridges alleges that the Commonwealth destroyed George Robles' permit to carry a gun and his application for the permit; that these materials were potentially exculpatory; and that the materials were destroyed in bad faith, in violation of due process under Youngblood. Third Am. Pet. 213-14. This claim was not exhausted. The gun permit itself is referred to in Bridges' second PCRA petition at several junctures in the context of Bridges' factual narrative concerning allegedly undisclosed evidence that Robles was a drug-dealer with a motive to cooperate with the police to curry favor. See Second PCRA Pet. 15 n.5, 20, 24-25. But

111

the second PCRA petition nowhere suggests that the gun permit or permit application were destroyed by the police. This aspect of Claim XV was never exhausted, and I may not proceed to the merits.[25]

## VI. CONCLUSION

For the reasons stated above, Bridges' petition for habeas corpus relief is granted in part. Because I find that the Commonwealth violated Bridges' Due Process rights under Brady v. Maryland, 373 U.S. 83 (1963), Bridges is entitled to a new trial. He is further entitled to a new sentencing determination, because I find that his counsel rendered constitutionally ineffective assistance during the penalty phase. All of Bridges' other claims are denied.

**s/Anita B. Brody**

_____

ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:     Copies **MAILED** on _____ to:

---

[25] The Third Amended Petition does not disclose when Bridges learned or claims to have learned that the permit and/or application were destroyed, see id. at 214 (inferring "obvious destruction" of materials from the fact that they are now "conveniently gone"), and conceivably there may be good cause for Bridges' failure to present this claim to the state courts. In the absence of any developed argument along those lines, the Court will assume that Claim XV.C is procedurally defaulted. Cf. Sweger v. Chesney, 294 F.3d 506, 520 (3d Cir. 2002) (petitioner has the burden of showing cause and prejudice to forgive procedural default). Bridges may challenge this assumption via a motion to reconsider if there are any compelling grounds to forgive his apparent default.

**APPENDIX**

| Claim | Synopsis | Disposition |
|-------|----------|-------------|
| I.B.1 | <u>Brady</u> claim for failure to disclose impeachment evidence re: George Robles | GRANTED on the merits after plenary review |
| I.B.2 | <u>Napue</u> claim for prosecution's knowing reliance on false testimony re: George Robles | Denied on the merits after plenary review |
| I.B.3 | Ineffective assistance of counsel for failure to uncover Robles impeachment evidence | Unexhausted/defaulted |
| I.C | State-court denial of due process for failure to provide investigative funding in PCRA proceedings | Unexhausted/defaulted |
| I.D | State-court denial of due process for failure to provide pre-trial funding for a forensic expert | Unexhausted/defaulted |
| I.E | Denial of opportunity to call witnesses and put on a defense | Denied on the merits under § 2254(d) |
| II | Denial of notice and opportunity to defendant in admission of Robles' testimony | Exhausted only as a claim of ineffective assistance of counsel; ineffective-assistance claim denied on the merits under § 2254(d) |
| III | <u>Winship</u> claim re: jury instructions on conspiracy and accomplice liability | Denied on the merits under § 2254(d) |
| IV | Ineffective assistance at sentencing for failure to present mitigating evidence | GRANTED on the merits under § 2254(d) |
| V | Trial court's failure to instruct the jury | Exhausted only as an Eighth |

| | on ineligibility for parole during sentencing | Amendment and <u>Simmons</u> claim; denied on the merits under § 2254(d) |
|---|---|---|
| VI | Coercive jury instructions after deadlock at sentencing | Unexhausted/defaulted |
| VII | Admission of non-statutory aggravating evidence at sentencing re: George Robles' testimony | Exhausted only as a prosecutorial misconduct claim; denied on the merits under § 2254(d) |
| VIII | Consideration of invalid aggravating factor in penalty phase | Unexhausted/defaulted |
| IX | Prosecutorial misconduct at sentencing in closing argument | Denied on the merits under § 2254(d) |
| X | Jury pool did not represent fair-cross section of the community | Denied on the merits under § 2254(d) |
| XI | Jury pool tainted by pre-trial publicity | Denied on the merits under § 2254(d) |
| XII | Various trial court errors at voir dire | Denied on the merits under § 2254(d) |
| XIII | Lethal injection protocol as cruel and unusual punishment | Unexhausted/defaulted |
| XIV | Cumulative error | Unexhausted/defaulted |
| XV.A | <u>Youngblood</u> claim for bad-faith destruction of potentially exculpatory evidence (the van) | Exhausted in state court but procedurally defaulted |
| XV.C | <u>Youngblood</u> claim for bad-faith destruction of potentially exculpatory evidence (the gun permit/application) | Unexhausted/defaulted |